IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-02228-MSK-KMT

MICHELLE FELIX,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

_____

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court on a number of motions. These are: the *pro se* Plaintiff's "Motion to Alter Judgment" **(# 102)**, which the Court construes as Objections under Fed. R. Civ. P. 72(a) to a portion of an oral order entered by the Magistrate Judge **(# 100)** on November 5, 2009 compelling Ms. Felix to respond to certain interrogatories, the Defendant's response **(# 107)**, and Ms. Felix's reply **(# 109)**; Ms. Felix's "Second Motion to Alter Judgment" **(# 104**, as supplemented **# 105)**, which the Court construes as Objections under Rule 72(a) to the Magistrate Judge's November 13, 2009 Order **(# 101)** denying Ms. Felix's Motion to Compel **(#78)**, the Defendant's response **(# 107)**, and Ms. Felix's reply **(# 109)**; Ms. Felix's "Motion to Amend Judgment" **(# 106)**, which the Court construes as Objections under Rule 72(a) to the Magistrate Judge's September 29, 2009 Order **(# 82)** denying Ms. Felix's request to take certain depositions **(# 63)**, the Defendant's response **(# 107)**, and Ms. Felix's reply **(# 109)**; the Defendant's Motion for Summary Judgment **(# 140)**, Ms. Felix's response **(# 144**, as

1

supplemented **# 148, # 159**), and the Defendant's reply (**# 157**); Ms. Felix's Motion for

Summary Judgment[1] (**# 146**, as supplemented **# 160**), the Defendant's response (**# 161**), and Ms.

Felix's reply (**# 172**); and Ms. Felix's Motion for Leave to Amend the Complaint [2] (**# 171**), and

---

[1]With regard to all matters, the Court construes Ms. Felix's *pro se* filings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in Ms. Felix's use of legal terminology and proper English. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). *Pro se* status does not require – much less permit – the Court to become Ms. Felix's advocate or to devise arguments or claims for her. Nor does it relieve Ms. Felix of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law; In these regards, the Court will treat Ms. Felix according to the same standard as counsel licensed to practice law before the bar of this Court. *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

Ms. Felix's initial motion for summary judgment has blossomed into a profusion of additional motions to supplement previous filings, motions to "correct" previous filings to various degrees, to "withdraw" prior filings in favor of new filings, and various other types of relief. *See generally Docket* # 149, 167, 169, 170 (which, while styled as a "Motion to Strike" an affidavit submitted by the Defendant in support of its summary judgment motion, the Court construes to be an additional substantive response by Ms. Felix to that motion), 174, 176, 177, 178, 181, 182, 183, 184, 185, 185 (similar to # 170), 192; *see also Docket* # 185 (motion by the Defendant to strike the filings identified above). The Court declines to adjudicate each of these motions.

Notwithstanding her *pro se* status, with regard to compliance with procedural rules and standards, Ms. Felix is held to the same requirements as a lawyer. The Court would not tolerate an attorney filing repetitive supplements and corrections to prior filings without leave (particularly filings effecting substantive changes to motions and briefs occurring after the deadline for filing those motions or briefs had passed), and thus does not tolerate that practice from Ms. Felix either. Such filings pose a significantly increased burden on the Court, which must attempt to sift through an artificially-expanded docket to locate the numerous filings that constitute the motion papers, and burdens the Defendant, who must constantly respond to ever-evolving arguments, often with a shortened response period.

This Court set (**# 139**) the deadline for filing dispositive motions for May 3, 2010. Ms. Felix's Motion for Summary Judgment at Docket # 146 was filed on that date. Thereafter, she moved (**# 152**) to supplement that motion, and the Court granted (**# 158**) that request, directing the filing of any supplement by May 24, 2010. The supplement allowed was filed at Docket # 160. Thus, the Court deems Ms. Felix's summary judgment motion to consist of Docket # 146 and 160. The Court disregards all other filings by Ms. Felix relating to that motion.

[2]The motion was referred (**# 175**) to the Magistrate Judge for a recommendation. The Court withdraws that reference.

the Defendant's response **(# 186)**.[3]

**FACTS**

In determining the facts, the Court construes all showings most favorably to the non-movant. Following this brief summary, the Court discuss the facts in greater detail as appropriate throughout its analysis.

Ms. Felix, who is black and of Haitian national origin, was employed by the Defendant as a Social Caseworker. On September 26, 2006, she filed a complaint of race discrimination with the Career Service Authority, alleging that she had been denied an opportunity to transfer to another work unit although white co-workers had been permitted to do so. The Career Service Authority conducted a hearing in December 2006, and on January 29, 2007, the Hearing Officer issued a determination finding that there had been no discrimination against Ms. Felix.

According to the current operative pleading in this action,[4] the Second Amended Complaint **(# 16)**, Ms. Felix asserts seven claims regarding matters arising after the Hearing Officer's determination. Specifically, she contends that: (I) she was retaliated against for filing the complaint, in that she received negative comments in a performance evaluation in April 2007, a unjustified written warning in June 2007, and was harassed by her supervisors in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; (ii) she was discriminated against on the basis of her race and disability and retaliated against her for filing a second complaint of discrimination in June 2007, in that her doctors requested that the

---

[3]Oral argument not being of assistance to the Court, these matters are considered based upon the record.

[4]Ms. Felix has moved **(# 171)** for leave to file a Third Amended Complaint. The Court has referred that request to the Magistrate Judge for a Recommendation.

Defendant make certain reasonable accommodations of Ms. Felix's disabilities, and the Defendant refused to do so, in violation of Title VII and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; (iii) a claim of somewhat uncertain provenance, in that the Defendant "caused [Ms. Felix] emotional and mental harm . . . when they discharged her from her employment" and "violated [her] 14th Amendment rights to the enjoyment of life, means of acquiring property and pursuing happiness," because Ms. Felix "was embarrassed in front of her peers" and "has been unable to find suitable employment because all prospective employers suspect that she may have a medical condition . . . on account of the fact that she received a medical discharge from the Defendant"; (iv) another claim somewhat similar to that described in (iii) above, in that the Defendant "violated [her] 14th Amendment rights" because "the Defendant . . . refuse[s] to acknowledge their employees' disabilities so they won't have to accommodate them"; (v) the Defendant violated 42 U.S.C. § 1981 and § 1983 by failing to follow "established Career Service Rules," including rules limiting the ability of the Defendant to terminate employees for medical reasons, rules prohibiting discrimination on the basis of disability, rules requiring reasonable accommodation of disabled employees, and rules requiring investigation into complaints of harassment; (vi) a claim, apparently asserted pursuant to 42 U.S.C. § 1983, in that the Defendant retaliated against Ms. Felix for her exercise of her First Amendment rights, insofar as she had reported to the Head of Denver's Human Services" that her supervisors' decisions "were putting [her] clients' lives at risk," and the Defendant thereafter retaliated against her in the manner described above; and (vii) what appears to be a claim under 42 U.S.C. § 1983 that the Defendant violated her Substantive and Procedural Due Process rights under the 14th Amendment by failing to adequately investigate and correctly adjudicate her complaints to

the Career Service Authority.                    **ANALYSIS**

Although Ms. Felix has outstanding objections to certain discovery rulings, for efficiency purposes, the Court will address the summary judgment motions (mindful of the discovery rulings being challenged), then turn to the discovery issues to determine the extent to which those issues remain relevant.

**B.  Summary judgment motions**

1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment a responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it may point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## 2. Defendant's Motion

The Court turns first to the Defendant's motion for summary judgment. The Defendant seeks summary judgment in its favor on each of Ms. Felix's claims.

### a. Retaliation claims

The Defendant contends that Ms. Felix's first claim – that she was retaliated against after she filed a complaint with the Career Service Authority – is unavailing for several reasons.

First, the Defendant contends that Ms. Felix did not commence this action within 90 days of her receipt of a Right to Sue Letter from the Equal Employment Opportunity Commission ("EEOC") regarding a retaliation claim cognizable under Title VII. 42 U.S.C. § 2000e-5 describes a mandatory procedure by which employees must exhaust claims of discrimination through the EEOC before filing suit. Section 2000e-5(e)(1) requires that a Charge of Discrimination be filed within 180 days of the date of the unlawful employment practice that is the subject of the Charge. Once the EEOC completes its investigation, it typically gives the employee notice that the employee is now free to commence suit on the conduct alleged in the charge. Section 2000e-5(f)(1) provides that a lawsuit must be commenced within 90 days from the EEOC giving such notice.

The Defendant contends that the conduct underlying Ms. Felix's first claim was the subject of a Charge of Discrimination she filed with the EEOC on June 27, 2007. The EEOC notified Ms. Felix of her right to sue on this charge on May 7, 2008, and thus, Ms. Felix had until August 5, 2008 to commence suit on the conduct raised in that charge. This action was not filed until October 14, 2008, making any Title VII claims predicated on conduct described in the June 27, 2007 charge untimely.

Ms. Felix implicitly concedes that she did not timely file suit after receiving notice of her right to sue on the June 27, 2007 Charge. Instead, she argues that she filed a second Charge with the EEOC on November 16, 2007, addressing further instances of continuing pattern of retaliatory harassment occurring after the June 27 Charge. She contends that she timely commenced suit upon receiving notice of her right to sue on the November 2007 Charge.

Courts have generally found that, where an employee files multiple Charges of Discrimination encompassing the same events, the employee's 90-day period to commence suit begins running from the first date on which the EEOC gives the employee notice of the right to sue on one of the charges. *Washington v. City of Gulfport,* 351 Fed.Appx. 916, 918 (5th Cir. 2009) (unpublished), *citing Sparks v. Lowe's Home Center, Inc.,* 341 F.Supp.2d 671, 674 (E.D.Tx. 2004), *and Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 557 (11th Cir. 1997). This raises the question of whether, and to what extent, the two charges differ in scope and substance.

The June 2007 Charge alleges discrimination based on race, national origin, and retaliation. It states:

> Juanita Sanchez refused to let me switch from the unit of Whitney Kramish to the unit of Cheryl Wentworth in October 2006 . . . I filed a discrimination complaint with the Career Service Authority after my request was denied.
>
> [Ms. Kramish] has been harassing me ever since and [Ms. Sanchez] has been condoning and approving of the harassment. [Ms. Kramish] has . . . constantly accus[ed] me of things which aren't true. She blames me for situations where other employees are clearly at fault. She put a lot of negative statements on my yearly evaluation which are not true. . . My supervisors have given me a written reprimand which was without any valid basis. . . . I believe I am being retaliated against for complaining of discrimination.

The November 2007 Charge alleges discrimination on the basis of retaliation and disability. To the extent it addresses claims of retaliation, it states:

> In July 2006, I requested a transfer to a different unit because there was an opening. . . My request for transfer was denied. On September 25, 2006, I filed a complaint with the Hearings Office, alleging racial discrimination. . . . I started getting harassed by my supervisor and her supervisor in January 2007. In April 2007, I received negative statements on my evaluation which were false. On June 2007, I received an official write up. As a result, on or about July 3, 2007, I filed an EEOC charge.

The remainder of the November 2007 charge recites that Ms. Felix began an FMLA leave in June 2007, that she was released to return to work in September 2007, that the Defendant did not immediately honor her request for reasonable accommodation and instead required additional information, and ultimately discharged her on medical grounds.

But for inconsistencies regarding dates and minor details, it is apparent that the acts of retaliation alleged in each Charge are identical. Both Charges indicate that the conduct began after Ms. Felix filed a claim of discrimination, that it was conducted by both Ms. Felix's supervisor and her supervisor's supervisor, and that it took the form of negative statements in a performance evaluation and a written reprimand. Indeed, the November 2007 Charge expressly states that the harassing conduct being complained of was the basis for Ms. Felix filing an EEOC charge in "on or about" July 3, 2007, an obvious reference to the June 27, 2007 Charge. Thus, it is clear that both Charges relate the same instances of conduct through June 2007. In these circumstances, Ms. Felix was required to commence suit on the retaliation claims upon receiving notice of her right to sue on the June 2007 Charge.

Ms. Felix argues that the November 2007 charge added new instances of retaliatory conduct, and thus constitutes part of a "continuing violation." The Court finds this argument

unpersuasive.  The only new conduct alleged in the November 2007 charge concerns allegations that the Defendant discriminated against her by failing to accommodate her disability.  Assuming – without necessarily finding – that the failure to accommodate constitutes an adverse employment action that could support a claim of Title VII retaliation, the Court sees no reason why the addition of a single instance of alleged conduct should permit Ms. Felix to act as if the otherwise identical June 2007 Charge never existed.  Ms. Felix's November 2007 filing did not purport to supplant the June 2007 Charge, and the EEOC continued to process the June Charge even after the November Charge was filed.  Nor can the Court find any justification for an argument that an employee can repeatedly file incremental EEOC charges, each incorporating all of the discriminatory conduct previously alleged along with a new allegation, and elect to commence suit only after the EEOC completes processing of the last charge.  *See e.g. Gibbs v. General Motors Corp.*, 104 Fed.Appx. 580, 581-82 (7th Cir. 2004) (unpublished) (employee filed 4 charges and commenced suit only after EEOC completed processing of final charge, claims contained in first three charges deemed time-barred).

Ms. Felix argues that, because she alleges an ongoing campaign of harassment, she has stated a "continuing violation."  This reflects a misunderstanding of the limited application of the "continuing violation" doctrine.  When properly invoked, that doctrine excuses an employee from the requirement that a Charge be filed within 180 days of the discriminatory act as required by 42 U.S.C. § 2000e-5(e)(1).  *See generally National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002) (explaining limited application of doctrine in harassment-type situations).  The Defendant does not contend that Ms. Felix failed to file a timely Charge with the EEOC within 180 days of the allegedly discriminatory conduct, and thus, the doctrine has no

applicability here.[5]  Moreover, invocation of the "continuing violation" doctrine does not excuse an employee's failure to commence suit within 90 days of receiving notice of the right to sue from the EEOC.  *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 (6th Cir. 2001).

Accordingly, the Court agrees with the Defendant that Ms. Felix's Title VII retaliation claim, to the extent it is predicated on conduct encompassed by the June 2007 EEOC charge, is untimely under 42 U.S.C. § 2000e-5(f)(1).  To the extent a retaliation claim is cognizable, it must be based only on the conduct newly-alleged in the November 2007 Charge – that is, the Defendant's refusal to accommodate Ms. Felix's disability, its insistence upon her supplying additional medical and legal authority for her request, and its decision to nevertheless terminate her employment.

The Court then turns to the question of whether Ms. Felix has demonstrated that there are genuine issues of fact regarding a retaliation claim that is constrained to the events surrounding her request for a reasonable accommodation.  To establish a claim for retaliation under Title VII, an employee must show: (I) that she engaged in protected activity; (ii) that she suffered an adverse employment action; and (iii) that there is a causal connection between the adverse action and the protected conduct; the burden then shifts to the employer to articulate a non-retaliatory reason for the adverse action, and the employee bears the ultimate burden of showing that the employer's proffered reason is a pretext for retaliation.  *Fye v. Oklahoma Corp. Comn.*, 516 F.3d

---

[5]If Ms. Felix had never filed the June 2007 Charge, and her November 2007 Charge raised, for the first time, acts of harassment occurring prior to May 2007 – 180 days prior to the filing of the November Charge – she might be entitled to invoke the "continuing violation" doctrine to have the pre-May 2007 conduct deemed timely.  Because there is no dispute that the June 2007 Charge was timely as to all the conduct alleged therein, and the November 2007 Charge was timely as to the alleged disability discrimination, the "continuing violation" doctrine is not implicated.

1217, 1227 (10th Cir. 2008). The Defendant concedes that Ms. Felix's filing of claims of

discrimination in September 2006 (with the Career Service Authority) and June 2007 (with the

EEOC) constitute protected activity, satisfying the first element of the claim.[6]

The Court then turns to whether Ms. Felix has come forward with evidence to

demonstrate that she suffered an adverse employment action. Certainly, the Defendant's

decision to terminate her employment on medical grounds meets this requirement. However, to

the extent Ms. Felix alleges that any other actions by the Defendant are separately actionable, the

Court finds that argument to be without merit.

Arguably, the November 2007 EEOC Charge lists, as additional adverse actions, that the

Defendant "required that [she] provide case law supporting [her] disability and requested

reasonable accommodation" and, after convening a hearing, "decided [not to re-open] the

interactive process" concerning her request for an accommodation. To be considered "adverse"

for Title VII retaliation purposes, an action must be one which "might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington Northern

& Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006). Although a reasonable employee might

find an employer's request for "case law supporting her disability and requested reasonable

accommodation" to be excessively bureaucratic and burdensome, the ADA grants the employer

the right to make demands for additional information where the employee's entitlement to an

accommodation is unclear. *See e.g.* 29 C.F.R. § 1630, Appendix, § 1630.9 ("When the need for

an accommodation is not obvious, an employer, before providing a reasonable accommodation,

_____

[6]Ms. Felix alleges that she also filed a second charge of discrimination with the Career
Service Authority on or about June 22, 2007. Nevertheless, the June 27, 2007 EEOC charge
would be the latest instance of protected activity.

may require that the individual with a disability provide documentation of the need for accommodation"). Thus, a reasonable employee would not consider such a request a deterrent against filing a charge of race discrimination, and thus, such a request does not constitute an adverse employment action for Title VII retaliation purposes. Nor does the fact that the Defendant ultimately elected not to "re-open the interactive process" after Ms. Felix submitted additional information constitute the type of action that could be deemed "adverse" for retaliation purposes. The decision not to re-evaluate Ms. Felix's eligibility for an accommodation is part and parcel of the Defendant's decision to discharge her on medical grounds, and thus, is not separately actionable.

Thus, the only "adverse employment action" supporting Ms. Felix's Title VII retaliation claim is the Defendant's decision to refuse Ms. Felix's request for a reasonable accommodation and, instead, to terminate her employment on medical grounds. The Court then turns to the final element: whether Ms. Felix can show that the Defendant's decision was made "because of" her protected conduct. Most commonly, an employee attempting to show the causal relationship will do so by showing a close temporal proximity between the protected activity and the adverse action. *Fye*, 516 F.3d at 1228, *citing Haynes v. Level 3 Communications Inc.*, 456 F.3d 1215, 1228 (10th Cir. 2006). "Close" temporal proximity means a period of days or a few weeks – a six week period between protected conduct and adverse action might be sufficient, of itself, to indicate causation, but a three month period would not. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). If sufficient temporal proximity cannot be shown, the employee must come forward with some additional evidence from which the factfinder could infer some causal relationship between the two events. *Haynes*, 456 F.3d at 1228.

The record indicates that Ms. Felix began an approved medical leave on or about June 26, 2007, due to issues relating to depression and anxiety. On September 11, 2007, Ms. Felix's doctor authorized her to return to work, albeit with certain restrictions, including a change in supervision. The Defendant requested additional information, and on September 20, 2007, Ms. Felix's doctor provided the additional information. The Defendant, through its "ADA Coordinator," Rita Murphey,[7] convened an "interactive process meeting" on September 28, 2007 to discuss Ms. Felix's situation. As a result of that meeting, Ms. Murphy concluded that Ms. Felix was medically capable of performing all of the essential functions of her job, "except that you can not deal with one specific person, your immediate supervisor." Ms. Murphey noted that the request for a transfer to a different supervisor "is not a reasonable accommodation and we are unable to provide it." A letter memorializing the September 28, 2007 meeting indicates that the Defendant is "ending the interactive process and referring this matter back to the Denver Department of Human Services for their further determination regarding your personnel matter." On October 18, 2007, the Department of Human Resources notified Ms. Felix that her "disqualification from your position . . . is being contemplated in accordance with Career Service Rules," as a result of her "post-appointment incapacity." It advised that "a pre-disqualification meeting is scheduled for October 29, 2007." A November 21, 2007 letter from Ms. Murphey references "issues raised in pre-disqualification meeting," made certain findings about Ms. Felix's impairments, and "re-affirm[ed] [the] decision to end the interactive process and refer this matter back to the Denver Department of Human Services." On that same day, the Department of Human Services issued a letter "constitut[ing] official notification that you are

_____

[7]Ms. Murphey's letterhead indicates that her job is part of the Career Services Authority.

being disqualified, effective Wednesday, November 21, 2007 from your position."

Although this prolonged process makes it somewhat difficult to definitively fix a date upon which it can be said that Ms. Felix suffered an adverse employment action, the earliest possible date one could select would be September 28, 2007, the date upon which Ms. Murphey concluded that Ms. Felix's requested accommodation was not reasonable. One might reasonably assume that, from that point on, the die was cast and Ms. Felix's termination became inevitable. Even so, the period between Ms. Felix's last instance of protected conduct on June 27, 2007 and Ms. Murphey's decision on September 27, 2007 is exactly three months, a period of time which the 10th Circuit has expressly stated is too long to allow an inference of causal connection between the two events to be drawn from temporal proximity alone. *Anderson*, 181 F.3d at 1179. Thus, Ms. Felix must come forward with additional evidence that would suggest that the decision to reject her request for an accommodation was causally connected to her prior complaints of discrimination. *Haynes*, 456 F.3d at 1228.

She has not done so. Although there is a thematic link between the two actions – Ms. Felix's protected activity complained of harassment by her supervisors and the accommodation Ms. Murphey rejected involved reassignment to a different supervisor – there is no indication of any causal link; that is, there is no evidence that the decisionmaker, Ms. Murphey, based her decision on the fact that Ms. Felix had previously engaged in protected conduct. Ms. Murphey's statements in both the September 27 and November 21, 2007 letters make no reference whatsoever to Ms. Felix having engaged in protected activity, nor suggest that Ms. Murphey's decision was somehow influenced by that protected activity. Accordingly, the Court finds that Ms. Felix has failed to carry her burden of coming forward with evidence that would show that

the adverse employment action taken against her – removal from her position – was causally connected to her having engaged in protected activity. Under these circumstances, the Defendant is entitled to summary judgment on Ms. Felix's claim of retaliation in violation of Title VII.

Ms. Felix contends that she also asserts a retaliation claim under 42 U.S.C. § 1981, and that the pre-suit exhaustion requirements of Title VII do not apply to such a claim. The Defendant responds that Ms. Felix's articulation of the retaliation claim in the Second Amended Complaint makes no reference to § 1981, and purports to assert the claim only under Title VII. Construing Ms. Felix's *pro se* pleadings liberally, the Court will assume that she intended to assert a retaliation claim under any available statute, including § 1981. Thus, the Court will analyze her retaliation claim under § 1981 as well.

A retaliation claim is cognizable under § 1981. *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1958 (2008). A § 1981 plaintiff is not required to comply with the same pre-suit exhaustion requirements imposed on Title VII plaintiffs. *Id.* at 1959-60. In considering a retaliation claim under § 1981, the Court applies the same substantive analysis as used in Title VII retaliation cases. *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). The preceding analysis thus disposes of any § 1981 retaliation claim by Ms. Felix based on the decision to terminate her employment, and thus, the Court limits its analysis to the remaining adverse employment actions that it did not previously consider in the Title VII analysis. Ms. Felix points to three potential adverse employment actions that she suffered after engaging in protected conduct: (I) she received a performance evaluation with unjustified negative comments; (ii) she was given a written reprimand; and (iii) she was "harassed" by her

supervisors.

With regard to the performance evaluation, the record indicates that Ms. Felix was evaluated on or about April 9, 2007. Her overall ranking, on a scale from "Exceptional" to "Successful" to "Needs Inprovement," was "Successful." She was rated as "Successful" in every category of the "Job Duties" section, which includes assessments of, for example, making client contacts within a specified period of time, complete recordkeeping, and prompt closing of cases. In another section of the evaluation, entitled "Citywide Duties," she was rated as "Needs Improvement" in three of four sections. In the "Service" subsection, her supervisor commented that

> in the last year, I have responded to internal and external client
> complaints with regard to how [she] conducts business. Internally,
> I have dealt with complaints regarding [her] interaction with
> accounting staff as well as complaints from other APS supervisors
> and personnel who have been upset by the way [she] approaches
> them. Externally, I have received calls from the Ombudsmen, as
> well as nursing home staff that have been dissatisfied with the way
> [she] approaches conflicts and have experienced mis-
> communication with her. I have discussed these issues with [her]
> as they have occurred and it is important that [she] continue to be
> mindful of the diversity of work-styles inside and outside the
> agency, and maintain professional communication despite
> sometimes frustrating circumstances.

In the "Teamwork" subsection, her supervisor stated:
> [She] primarily works independently and does not spend as much
> time in the office as many of her co-workers. As a result, she is
> not often available to assist other team members and rarely
> volunteers to take part in group activities or projects. [She] does
> occasionally identify potential problems that face the entire APS
> section . . . [h]owever, she rarely has been open to discussing or
> implementing creative solutions or co-operative approaches to
> dealing with identified problems, placing the responsibility on
> others when they do not agree with her initial approach. On
> several occasions, [she] has questioned the actions and goals of her
> peers without making efforts to communicate with them directly in

a positive manner or looking at her own actions. One example of this is her response to perceived errors in the REPS system at which point she places the blame on accounting staff, immediately questioning their competency and actions when often the error is actually her own or shared.

In the "Accountability" subsection, her supervisor rated her as "Successful," but included a comment that "during this evaluation period, she asked this supervisor to break confidentiality when she suspected but did not substantiate possible neglect of a client[; i]t is important that [she] maintain a professional level of conduct, which includes keeping client information confidential. . . ." In the "Respect for Self and Others" subsection, the supervisor stated that "I have received complaints from clients and co-workers about [her] interaction with them. People often interpret [her] approach as rude even if this is not her intent. . . . I often have to approach [her] regarding her conduct, specifically noise level, in the cubicle area as she is often disruptive to others' work. Although she is open to redirection here, the problem continues."

In her response to the Defendant's motion, Ms. Felix identifies the "negative comments" in the evaluation that she contends were retaliatory: (I) the statement that her supervisor "had received complaints regarding [Ms. Felix's] interactions with accounting personnel and others" was untrue, in that Ms. Felix "asked [the supervisor] about this" and was told about a single instance in which the office cashier complained that Ms. Felix was instructing certain clients to come to the office to pick up checks instead of Ms. Felix bringing the checks to the clients' homes; (ii) the reference by the supervisor to complaints from "Ombudsmen," social workers, and nursing home staff is misleading, as there "was just one incident involving one ombudsman, but [the supervisor] said 'ombudsmen' making it sound like there were several complaints"; that only one complaint "came from a social worker at a nursing home who got upset when she found

out that Denver Human Services has a policy of returning money to Medicaid when a client has too much money," and that this complaint "was not really about [Ms. Felix] but about this policy of DDHS"; and that only one complaint was received from a nursing home staffer who "had a grudge against [Ms. Felix] because [Ms. Felix] removed two of her clients from [the] nursing home . . . because the nursing staff could not protect [them]" and that the staffer "started documenting in [a] patient's chart that the patient did not like his guardian [Ms. Felix]," when in fact the patient "was too demented to know that he had a guardian"; (iii) the comment that Ms. Felix did not assist other team members or take part in group activities was inaccurate, and Ms. Felix recites certain instances in which she volunteered to help teach classes to other employees on a certain subject or participated in work-related committees; (iv) the comment that Ms. Felix blamed the accounting staff for making mistakes is misleading, in that Ms. Felix complained to her supervisor about one accounting staffer in particular, "hoping that she would speak to [the staffer's] supervisor about the mistakes and that although other caseworkers also complained about the staffer's mistakes, Ms. Felix's supervisor "found a way to turn the situation around and blame [Ms. Felix]"; (v) the comment regarding "breaking confidentiality" was misleading because the event involved Ms. Felix receiving a letter from a client's doctor, accusing the client's caretaker of neglect or abuse, and Ms. Felix asked her supervisor to call the agency that employed the caretaker and advise them of the allegations; (vi) although the supervisor stated that she had received complaints about Ms. Felix from co-workers, when Ms. Felix inquired about this comment, she was told about only one situation where a client was "upset because

[Ms. Felix] refused to pay her cable bill"[8] and that the supervisor "found a way to turn it into a negative complaint," and that the supervisor "admitted that she has not been able to confirm any complaints from co-workers[9] about [Ms. Felix]."

The Court finds that none of the cited criticisms in the evaluation, taken individually or as a whole, suffice to sufficient to support a retaliation claim. Even under the more relaxed standards applied in a retaliation claim, the evaluation (and the criticisms contained within it) does not constitute an adverse employment action. A reasonable employee recognizes that a performance evaluation is a largely subjective exercise and that constructive criticism from one's supervisor is an inherent part of that process. There may be circumstances in which an fear of an adverse performance evaluation or particular criticisms therein might deter an employee from engaging in protected activity – say, where obtaining a certain score on the evaluation is a requirement to become eligible for a promotion or raise, or where the criticism is particularly insulting or irrelevant – but there is no such evidence here. Ms. Felix has not contended that the 2007 evaluation impaired her ability to advance in her job or salary. At best, she alleges only that the comments made her feel upset. Moreover, she essentially admits that many of the

---

[8]The client's request is not as preposterous as it might seem on the surface. Ms. Felix explains that, as a Caseworker, she sometimes receives Social Security payments on behalf of clients and "manage[s] the clients' money," using it to pay some of the clients' bills. Ms. Felix contends that she did not believe it was appropriate to pay this particular client's cable bill because the client "was on a limited income and did not have much money," but "continued to order adult films on cable bringing her cable bill to $ 300 a month," and if Ms. Felix had paid the cable bill as requested, the client "would [not] have enough money for food each week."

[9]Ms. Felix's cited evidentiary support for the proposition that her supervisor was "unable to confirm any complaints from co-workers" about her is a lengthy memo from Ms. Felix to Ms. Sanchez, dated May 3, 2007, in which Ms. Felix extensively discusses various concerns. In that document, she states that the supervisor "admitted that she has not been able to confirm a lot of the complaints."

negative comments have, at their core, a kernel of truth – she admits that an ombudsman, nursing home staffer, and co-workers had registered complaints about her, and her disagreement is with the gloss that her supervisor placed on these events.

Although the Court has no doubt that Ms. Felix sincerely felt aggrieved by these comments, the Court considers them from a neutral perspective and finds them to be constructive criticism growing out of the supervisor's observations. To hold otherwise would be to suggest that, once an employee engages in protected conduct, she cannot be subjected to any criticism with which she disagrees. In these circumstances, the Court cannot find that the comments in the evaluation constitute an "adverse employment action" under the standards set forth by the Supreme Court in *White*.

The Court also finds that Ms. Felix cannot show a causal connection between her protected conduct – the filing of a complaint with the Career Service Authority in September 2006 – and her evaluation in April 2007. More than six months separate the two events, and thus, the temporal proximity of the two events is far too remote to permit an inference of causality to be drawn from timing alone.[10] Ms. Felix is thus required to come forward with additional evidence that would demonstrated that the performance evaluation was somehow connected to her filing of a discrimination complaint. This, she has not done. The evaluation itself makes no reference, expressly or implicitly, to Ms. Felix having filed a complaint, and Ms. Felix has not identified any statements attributable to her supervisor or anyone else that tie the

---

[10]Even assuming that one measured temporal proximity not from the filing of the discrimination complaint itself, but from, say, the December 2006 Career Services Authority hearing or the January 29, 2007 adjudication of Ms. Felix's complaint, the April 2007 evaluation is still removed from any action relating to the discrimination complaint by some nine weeks.

evaluation to the discrimination complaint. Without such a showing, Ms. Felix fails to demonstrate a *prima facie* case of retaliation as it relates to the performance evaluation.

Next, Ms. Felix complains that she suffered an adverse employment action when she was issued a written reprimand. She contends that on May 23, 2007, she was informed that discipline against her was being contemplated, and on June 13, 2007, she was officially issued a written reprimand. The reprimand recited several instances of conduct that Ms. Sanchez, the author of the reprimand, considered insubordinate and unprofessional. It informed Ms. Felix that "you consistently question directives given to you by managers and supervisors regarding communication and following the chain of command and following adult protection procedures and protocols." The reprimand reminded Ms. Felix that "it is your responsibility to follow through with decisions made and follow policies and procedures," emphasized that "you and [the supervisor] establish an effective working relationship," and directed Ms. Felix to attend specified classes on interpersonal skills and customer service, among other things.

The Court finds that the issuance of the reprimand does not support a claim for retaliation. There is some doubt as to whether the reprimand constitutes an adverse employment action – *i.e.* that it would be expected to deter a reasonable employee from engaging in protected conduct. Courts have been reluctant to deem written counseling, warnings, or reprimands to constitute adverse actions under *White*. For example, in *Chang v. Safe Horizons*, 254 Fed.Appx. 838, 839 (2d Cir. 2007) (unpublished), the court characterized written warnings issued to an employee as the kind of "trivial harms" described by *White*, particularly where the employer is nominally applying its existing disciplinary rules and policies in a reasonable manner. In *Shockency v. Ramsey County*, 493 F.3d 941, 950 (8th Cir. 2007), the court affirmed the grant of

summary judgment to an employer on a retaliation claim where the employee claimed that his supervisor "criticized him in writing and placed reprimands in his file for routine actions which other officers were allowed to do without criticism," among other things. The court recognized that although such actions diminished the employee's job satisfaction, "it was not significantly more severe than exhibiting general hostility which is insufficient to be an adverse employment action." *Id.* In *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed.Appx. 437, 442 (5th Cir. 2007) (unpublished), the court found that a written warning issued for "insubordination, for being argumentative, and for excessive absenteeism" was not an adverse action where "there were colorable grounds for the warning and a reasonable employee would have understood that a warning under these circumstances was not necessarily indicative of a retaliatory mind-set."

The warning issued to Ms. Felix is similar to the warnings described in these cases. It recites, in considerable detail, the policies that Ms. Sanchez found Ms. Felix to have violated and the specific conduct constituting those violations. Ms. Felix contends that "she was able to prove that all of the allegations against her were false," but the letter that she cites in support of this contention verifies certain key facts in the written reprimand. For example, one of the events discussed in the reprimand concerned Ms. Felix disagreement with her supervisor's assessment of a situation where a home care worker took a client into the worker's own home for ongoing monitoring. The reprimand criticized Ms. Felix for insubordination in refusing to accept her supervisor's approval of the situation and instead seeking the intervention of another supervisor. Ms. Felix's own response to the reprimand acknowledges that "I told [the other supervisor] since I could not convince [Ms. Felix's direct supervisor] that we are taking the wrong course with this client, maybe she could. I thought that [the direct supervisor] would be

willing to listen to a fellow supervisor."  Ms. Felix also acknowledges that her supervisor "wanted a home study done" by Ms. Felix, but that Ms. Felix did not believe she was qualified to do so.  In another portion of the reprimand, Ms. Felix is criticized for not having her supervisor present when taking inventory of a client's possessions.  Ms. Felix acknowledges that she took an inventory of a client's possession without her supervisor present, and acknowledges that she was trained to "Always take your Sup[ervisor] into a client's home for inventory," but protests that "it does not explain under what circumstances."

Again, the Court recognizes that Ms. Felix disagrees with the gloss placed on these events by her supervisor and Ms. Sanchez, but there is at least a colorable basis for Ms. Sanchez's findings in the reprimand.  The reprimand reflects an attempt by the Defendant to apply its pre-existing disciplinary rules to a situation where, at least on some level, those rules were arguably violated.  A reasonable employee might disagree with discipline of this nature being imposed, but there is nothing in the reprimand issued to Ms. Felix that would lead a reasonable employee in the same circumstances to correlate the reprimand with acts of protected conduct, such that the reprimand would deter the employee from engaging in that protected conduct.  (Indeed, although not strictly relevant, the Court notes that the reprimand did not deter Ms. Felix from thereafter engaging in protected conduct by filing an EEOC complaint.)  Accordingly, Ms. Felix has failed to show that the reprimand constituted an adverse employment action for purposes of a retaliation claim.

Moreover, for the same reasons discussed above with regard to the performance evaluation, Ms. Felix has failed to show any causal connection between an act of protected conduct – the September 2006 complaint – and the reprimand issued in May/June of 2007.  As

stated above, one cannot draw any causal inference from the lengthy period between the two events, and Ms. Felix has not come forward with any additional evidence that could lead one to conclude that the reprimand was imposed in retaliation for the discrimination complaint made more than six months earlier. Accordingly, Ms. Felix has failed to demonstrate a *prima facie* case of retaliation based on the reprimand.

Finally, Ms. Felix alleges that she was subjected to various acts of "harassment" by her supervisor, allegedly as retaliation for filing the charge of discrimination. The Court will not attempt to extensively recite the various instances Ms. Felix recites. It is sufficient to note that Ms. Felix simply complains of instances in which her supervisor was rude to her or gave inconsistent or confusing instructions to Ms. Felix. The Court finds that each of these instances, individually or in concert, amount to nothing more than the type of "petty slights or minor annoyances" that *White* finds to be non-actionable. 548 U.S. at 68 (explaining that "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable").

Finally, the Court turns to Ms. Felix's claim that she was retaliated against for exercising her First Amendment rights. To establish such a claim, Ms. Felix must show: (I) that she engaged in constitutionally-protected activity, (ii) that the Defendant took an action against her that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that the adverse action was substantially motivated as a response to the constitutionally-protected activity. *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010).

The Second Amended Complaint identifies the protected conduct underlying this claim as being "reporting to the Head of Denver Human Services that [Ms. Felix's] immediate

supervisor's decisions were putting [Ms. Felix's] clients' lives at risk." It identifies the alleged adverse actions suffered by Ms. Felix in retaliation as being: (I) the refusal to grant her request to transfer to a different unit; (ii) the refusal to investigate her complaints of harassment; (iii) the negative comments in her performance evaluation; (iv) the written reprimand; and (v) her termination.

The Court has canvassed Ms. Felix's briefing on this issue and admits that it does not understand what constitutionally-protected activity (beyond the complaints of discrimination, already addressed above[11]) that Ms. Felix claims to have engaged in. In her initial summary judgment response, she states that she "reported to her supervisors that their practice of hiring inexperienced supervisors was a threat to public safety in that it was placing the clients' lives at risk." The incident she appears to be referring to was a situation occurring "on or around September 7, 2006" when she "report[ed] to [Ms. Sanchez] that [Ms. Kramish] lacks the experience and knowledge required to supervise the Adult Protection Unit and her decisions were placing [Ms. Felix's] clients' lives at risk."

The statement recited by Ms. Felix was not constitutionally-protected. In the context of government employment, the determination of whether speech enjoys First Amendment protection is subject to a two-part analysis: (I) is the employee speaking as a citizen on a matter of public concern; and (ii) does the government have an adequate justification for treating the

---

[11]Because the elements of a First Amendment retaliation claim closely resemble the elements of a claim of retaliation under § 1981 and Title VII, to the extent that Ms. Felix alleges that she suffered First Amendment retaliation based on protected conduct or adverse actions previously discussed by the Court, the Defendant would be entitled to summary judgment on the First Amendment retaliation claim for the same reasons already given. *Couch v. Board of Trustees*, 587 F.3d 1223, 1237 (10th Cir. 2009) (analogizing Title VII retaliation analysis under *White* to that used in First Amendment context).

employee differently from members of the general public. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Where the speech in question is that made by an employee to her supervisor, in the course of carrying out her duties, the communication is not protected by the First Amendment. *Id.* at 421. Here, Ms. Felix's complaints about Ms. Kramish to Ms. Kramish's own supervisor was an "official communication hav[ing] official consequences." *Id.* at 422. Because her speech was not constitutionally-protected, the Defendant is be entitled to summary judgment on her First Amendment retaliation claim.

Accordingly, the Defendant is entitled to summary judgment on all of Ms. Felix's retaliation claims, whether they arise under Title VII, § 1981, and as a result of her exercise of First Amendment rights.

b. Race discrimination claims

Ms. Felix apparently contends that her second claim for relief asserts that she was discriminated against because of her race. She identifies the following adverse actions as resulting from this form of discrimination: (I) the denial of her request to transfer to a different unit when white and Hispanic workers were allowed to do so; (ii) her termination on medical grounds when a white employee "was allowed to stay out on Family Medical Leave past the three months allowed without losing her job"; and (iii) being issued the written reprimand for "breaking confidentiality" when a white employee was not similarly disciplined for doing so.

To establish a claim for race discrimination under either Title VII or § 1981, a plaintiff must first show a *prima facie* case that: (I) she is a member of a protected class, (ii) she suffered an adverse employment action; and (iii) the adverse employment action occurred in circumstances giving rise to an inference of discrimination; if she carries that burden, the

employer then has the burden to articulate a legitimate, non-discriminatory reason for the adverse action, and the plaintiff bears the ultimate burden of proving that the employer's proffered reason is a pretext for discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

The Court has already concluded that, to the extent Ms. Felix seeks to assert Title VII claims based on assertions in her May 2007 EEOC Charge, those claims are untimely. This alone is sufficient to dispose of any race discrimination claims relating to the denial of the transfer and the written reprimand. Moreover, the Court has previously determined that the written reprimand does not constitute an adverse employment action even under the more liberal standard of retaliation claims. Thus, it cannot constitute an adverse employment action for purposes of a race discrimination claim, which requires that the action effect "a significant change in the plaintiff's employment status . . . such as affecting the likelihood that the plaintiff will be terminated, undermining the plaintiff's current position, or affecting the plaintiff's future employment possibilities." *Id.* For similar reasons, the denial of Ms. Felix's request to transfer from one work unit to another is not an adverse employment action. Ms. Felix does not dispute the Defendant's contention that the transfer would not have altered Ms. Felix's job responsibilities or benefits in any way; by Ms. Felix's own admission, the sole purpose of the request was to obtain a different supervisor while otherwise performing the same work. Because the denial of the transfer did not materially affect Ms. Felix's terms and conditions of employment in any way, the denial does not constitute an adverse employment action for purposes of her race discrimination claim.

Thus, the Court turns to the remaining alleged adverse action: the decision to terminate

Ms. Felix's employment upon the expiration of her medical leave.[12]  There is no question that the termination of her employment constituted an adverse action.  Ms. Felix then contends that her termination gives rise to an inference of discrimination because a white employee, Cheryl Breiner, was allowed to remain out on an extended medical leave without losing her job.  However, the Court finds that Ms. Breiner was not similarly-situated to Ms. Felix such that different treatment received by Ms. Breiner gives rise to an inference of discrimination.

The record indicates that Ms. Breiner left work in July 2007 on a Family and Medical Leave Act leave for a hip surgery.  Ms. Breiner exhausted her three months of approved leave, and then got "special permission" to take an additional three months of unpaid leave.  In contrast, Ms. Felix exhausted her three month of approved leave and, at the conclusion of that leave, asserted that she was unable to return to work due to a disability and required a reasonable accommodation.  At that point, her situation diverged radically from Ms. Breiner's, preventing them from being treated as comparable.  Because Ms. Breiner was not similarly-situated to Ms. Felix, and Ms. Felix has not adduced any other evidence that would suggest that her termination was based on her race, the Court cannot find that Ms. Felix has not carried her burden of

---

[12]The Court rejects the Defendant's argument that Ms. Felix failed to properly exhaust this claim with the EEOC or to timely commence suit upon receiving notice of her right to sue on her November 2007 EEOC Charge.  The November Charge, although filed before Ms. Felix's termination was formally effected, makes clear that the Defendant was refusing to allow her to return to work for medical reasons and had scheduled a "pre-dismissal meeting"  Thus, Ms. Felix's post-Charge termination for the same reasons would certain fall within the scope of the EEOC's investigation into the charge, and thus, falls within the scope of the Charge.  *Jones v. United Parcel Serv.*, 502 F.3d 1176, 1186 (10th Cir. 2007).  The Defendant's argument that Ms. Felix's commencement of this case occurred on the 91st day after she received notice of her right to sue, rather than the 90th day, is without merit.  The 90th day, October 13, 2008, was a federal holiday, and thus, under Fed. R. Civ. P. 6(a)(3), (6), the action was timely filed on the following day.

demonstrating a *prima facie* case of race discrimination.  Accordingly, the Defendant is entitled to summary judgment on all of Ms. Felix's claims sounding in race discrimination.

c. <u>Disability discrimination</u>

Ms. Felix's remaining statutory claim is for discrimination on the basis of disability in violation of the ADA.  The ADA requires that an employer make "reasonable accommodation" of disabled persons who are "otherwise qualified" for the position in question.  42 U.S.C. § 12112(a), (b)(5)(A).  To establish a claim for unlawful termination under the ADA, a plaintiff must show: (I) that she is "disabled" within the meaning of the ADA; (ii) that she was able, with or without reasonable accommodation, to perform the essential functions of the job; and (iii) that the employer terminated her because of that disability. *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995).  If the employee makes that showing, the employer then has the burden of proffering evidence that demonstrates an inability to provide a required accommodation, and the employee has the ultimate burden of persuasion to rebut that evidence.  *Id.*

The record reflects that Ms. Felix claims to have two types of disabilities: a group of physical impairments resulting from a car accident in 1998 that affects her ability to perform physical tasks such as standing and sitting for extended periods of time; and a group of mental and cognitive impairments resulting from "harassment from my immediate supervisor" at work that has resulted in a diagnosis of depression, anxiety, and impairments to her ability to read, concentrate, and sleep.  The physical impairments predate Ms. Felix's employment with the Defendant and she does not require any particular accommodations of her physical disability to

continue to perform her job.[13]  With regard to the impairments resulting from the "harassment,"

Ms. Felix's psychologist requested "a transfer to a different [work] unit" – that is, reassignment

to another supervisor.

There is some ambiguity in the record regarding the precise nature of the restrictions

placed upon Ms. Felix by her doctors, and the extent to which Ms. Murphey understood those

restrictions.   Among other things, it is somewhat unclear whether Ms. Felix's mental health

provider indicated that Ms. Felix was <u>capable</u> of performing the essential functions of her job

regardless of whether a supervisor change occurred and the request for a transfer was simply

preferable, or whether the provider indicated that Ms. Felix was <u>incapable</u> of performing the

essential functions of the job unless a supervisory change was effected; whether Ms. Murphey

concluded that Ms. Felix was not disabled and thus not entitled to a reasonable

accommodation,[14] or whether she was disabled but requesting an <u>unreasonable</u> accommodation;

and whether Ms. Felix ever expressed an unwillingness to return to work if an accommodation in

---

[13]Ms. Felix contends that the stress resulting from dealing with her supervisor has exacerbated her physical impairments, but appears to acknowledge the expectation that, if granted a reassignment to a different supervisor, that exacerbation would abate and she could return to performing her job as she previously had been.

[14]The 10th Circuit has indicated that "the major life activity of working cannot be substantially impaired if a plaintiff cannot work under a certain supervisor because of the stress and anxiety it causes."  *MacKenzie v. City and County of Denver* 414 F.3d 1266, 1276 (10th Cir. 2005).  Ms. Felix claims to be impaired in the major life activity of working (among others), but only indirectly attributes this impairment to the stress of working under her supervisor.  She explains that stress exacerbates existing physical impairments that, in turn, limit her ability to perform tasks common to a broad range of jobs.  At the same time, she admits that these physical impairments do not ordinarily impair her ability to perform her own job, and thus, the *sine qua non* of her claimed impairment in the ability to work (as well as to perform other major life activities) is the stress caused by her supervisor.  This Court has grave doubts that the holding of *MacKenzie* can be circumvented in this way, but, because the Court finds Ms. Felix's disability discrimination claim to be without merit on other grounds, need not address this issue further.

the form of a supervisory transfer was not provided.  Nevertheless, the Court's review of the record indicates that, ultimately, Ms. Murphey concluded that "the accommodation you are requesting, a change of supervisor, is not a reasonable accommodation."  This is essentially a conclusion of law, and thus, the Court examines the parties' submissions on the question of whether an employee may demand, as a reasonable accommodation of a disability, a change of supervision.

Most courts that have considered the question have concluded that a request for reassignment to a different supervisor is not a reasonable accommodation.  *See e.g. Coulson v. Goodyear Tire & Rubber Co.*, 31 Fed.Appx. 851, 957 (3d Cir. 2002) (unpublished) ("although transfer can be a reasonable accommodation, under these circumstances it would not be. Coulson is seeking to force Goodyear to transfer him so that he will not be required to work with certain people. As the magistrate judge noted, this would be asking the court to establish . . . with whom he will work"), *quoting Gaul v. Lucent Technolgies, Inc.*, 134 F.3d 576, 581 (3d Cir. 1998); *Weiler v. Household Finance Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) ("Weiler's solution is that she return to work under a different supervisor. But that decision remains with the employer. In essence, Weiler asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility").   A slightly more moderate position was taken by the Second Circuit in *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122-23 (2d Cir. 1999).  There, the court explained that:

> in this Circuit, the question of whether a requested accommodation
> is a reasonable one must be evaluated on a case-by-case basis.  A
> per se rule stating that the replacements of a supervisor can never
> be a reasonable accommodation is therefore inconsistent with our
> ADA case law.  There is a presumption, however, that a request to
> change supervisors is unreasonable, and the burden of overcoming

the presumption (*i.e.* of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable) therefore lies with the plaintiff.

(Citations omitted.)  It does not appear that the 10th Circuit has clearly spoken on this question.

In contrast, although Ms. Felix cites to several cases which she contends stand for the proposition that "employers have changed supervisors as a reasonable accommodation," none squarely stand for the proposition that an employer must honor a request for a transfer of supervision if such a transfer is presented as a potential reasonable accommodation.  The case most supportive[15] of Ms. Felix's position here is *Geuss v. Pfizer*, 971 F.Supp. 164, 174-75 (E.D.Pa. 1996).  There, the court affirmed a jury's verdict in favor an the employee on a disability discrimination claim. Among other things, the employee contended that a transfer from a new supervisor (who assigned him to duties that exacerbated his condition more frequently than his old supervisor did) to his old supervisor – now overseeing a different division – would have been a reasonable accommodation.  *Id.* at 173.  The trial court rejected the employer's argument that "an employer has no duty under the ADA to consider transfer to a different company as a possible means of reasonable accommodation," and instead found that the employer's own citations to cases stood for the proposition that "an employer is required to offer

_____

[15]Ms. Felix's remaining cases are inapposite.  In *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 171-72 (1st Cir. 1998), the employer voluntarily provided a change of supervision as an accommodation, and nowhere in that case does the court find that such a transfer would have been required had the employer refused to do so.  *Christiano v. Spokane County Health Dist*, 969 P.2d 1078, 1081 (Wa. App. 1998) does not arise under the ADA, and, in any event, also involves an employer who voluntarily acceded to the employee's request for a different supervisor. Finally, *Horgan v. Whitaker*, 871 N.Y.S. 2d 443, 445 (App. Div, 3d Dept. 2008) also arose under state law, not the ADA, and adopts the rule in *Kennedy* that there is no *per se* rule that a change of supervisors cannot be a reasonable accommodation, but there is a reubttable presumption that such a request is unreasonable.

transfer to another facility when there is a practice of the employer doing so." *Id.* The court found that the evidence at trial established both that the employer had a history of permitting transfers of this type, and that there was a job opening in the old supervisor's department, and thus, the jury could reasonably have concluded that the employer's failure to allow a transfer constituted discrimination. In essence, *Geuss* applies the rule articulated in *Kennedy* – an employer <u>might</u> be required to transfer an employee to a new supervisor (or department) to accommodate the employee's disability but, at a minimum, the employee must first show that the employer abides such transfers in other situations and that there is an available job opening to be transferred to.

This Court finds that *Kennedy* provides an approach that is consistent with ADA law and regulations that contemplate a transfer as a possible means of reasonable accommodation, yet wisely recognizes that requests for a change of supervision as a reasonable accommodation can be organizationally disruptive and subject to abuse. Thus, this Court will apply the *Kennedy* analysis here, presuming that Ms. Felix's request for a change in supervisors was unreasonable but allowing Ms. Felix to come forward with evidence that would overcome that presumption. Cases such as *Kennedy* and Ms. Felix's own citation to *Geuss* give some indication of what must be shown by the employee to overcome the presumption. *Kennedy* requires the employee to show that the requested transfer can, in the context of the particular workplace, "be accomplished without excessive organizational costs." 193 F.3d at 123. (The Court reads the phrase "organizational costs" not to refer to monetary costs that the employer would incur in effecting the requested transfer, but rather, to the degree of disruption the transfer would work on the employer's decision to select a particular personnel structure and hierarchy. *Id.* at n. 2.) A

34

case like *Geuss* shows that there is little "organizational cost" to accommodating an employee with a transfer where the employer allows such transfers in other situations and where there is an existing opening under the transferee supervisor.  In contrast, where there is no employer practice of permitting transfers of this type or where there is no existing opening for the disabled employee to fill – thus requiring that the employer either create a new position under the transferee supervisor or require another employee to "switch" supervisors with the disabled employee – the "organizational costs" become much more onerous and the reasonableness of supervisory transfer as an accommodation is diminished.

Here, Ms. Felix has not come forward with evidence that would overcome the presumption that a supervisory transfer would be unreasonable.  There is some evidence in the record that  a number of employees were permitted individual transfers from the "intake unit" to the "ongoing unit" or vice-versa,[16] and that disagreements over supervision was at least part of the reason that one employee, Barbara Smithson, sought a transfer.  However, Ms. Felix has not come forward with evidence that, at the time she sought a reasonable accommodation in late 2007, there was an open job available under another supervisor.  The only reference in the record to there being an open position under another supervisor was when Ms. Felix initially sought a transfer to that open position in late 2006.  Absent evidence that there was an available opening at the time Ms. Felix sought a reasonable accommodation for her disability, Ms. Felix's request would clearly have a significant organizational cost, as it would either disrupt the existing

---

[16]The Defendant points out that although there is evidence of transfers between the "intake" and "ongoing" units, there is no history of transfers like that requested by Ms. Felix – from one "ongoing" unit to the other.  Ms. Felix alleges, however, that there is no functional difference in the work performed by the "intake" and "ongoing" units, and, for purposes of deciding the Defendant's motion, the Court takes Ms. Felix's contention as true.

supervisory balance and workload (adding one more subordinate to the new supervisor and removing one subordinate from the old supervisor), or would require the Defendant to facilitate Ms. Felix's transfer by "trading" a subordinate among supervisors, causing disruption to both the Defendant and other employees. *See generally* 29 C.F.R. § 1630 Appendix, § 1630.2(o) (discussing "reassignment to a <u>vacant</u> position" as a possible reasonable accommodation).

Accordingly, because Ms. Felix has not shown that there was an open position with another supervisor that she could have transferred to in late 2007, she has failed to show that such a transfer could have been effectuated without significant "organizational cost" to the Defendant and thus, has failed to rebut the presumption that a transfer of supervision is not a reasonable accommodation. Therefore, the Defendant is entitled to summary judgment on her claim of disability discrimination in violation of the ADA.

d. <u>Constitutional claims</u>

Ms. Felix's remaining claims appear to be in the nature of Substantive Due Process claims under 42 U.S.C. § 1983, in that she possessed a property interest in her continued employment (as a result of Career Service Authority rules that require certain process before an employee can be terminated), and that the Career Service Authority's decisions in investigating and adjudicating her complaints about her treatment were "arbitrary and capricious," thus depriving her of that property interest without Due Process.

Putting aside other concerns that the Court has with regard to this claim, the Court finds that Ms. Felix has failed to come forward with evidence that the Career Service Authority's decision that her complaints of discrimination and retaliation were merit less was "arbitrary and capricious." For purposes of a Substantive Due Process claim, "only the most egregious official

conduct can be said to be arbitrary." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). To rise to this level, the conduct must "shock the conscience." *Id.* at 846-47. The conduct must be more than simply negligent, although the plaintiff is not necessarily required to show intentional misconduct. *Id.* at 847.

The Court finds that Ms. Felix's has failed to demonstrate that the Career Services Authority's disposition of her discrimination and retaliation complaints was not "conscience shocking." It may be (although this Court makes no particular findings on this point) that Ms. Felix is correct that the Career Services Authority made factual errors in its analysis of the evidence or the applicable employment rules, but Ms. Felix has failed to adduce anything more than outright speculation that such errors were the result of anything more than negligence on the part of the Hearing Officer. Certainly, Ms. Felix has not come forward with any evidence of any greater culpability on the part of the Hearing Officer, notwithstanding her insistence that the Hearing Officer's failure to agree with her position somehow constitutes "deliberate indifference" to Ms. Felix's rights. Ultimately, the Hearing Officer was required to decide not just whether the Defendant failed to strictly follow employment rules and policies in Ms. Felix's situation, but whether the Defendant failed to follow the rules because of a discriminatory or retaliatory intent against Ms. Felix. Having reviewed the record in this case, including lengthy excerpts of the transcript from Ms. Felix's December 15, 2006 Career Services Authority hearing (relating to the complaints of discrimination and retaliation arising from the denial of her requested transfer), as well as a portion of the transcript of the January 30, 2008 hearing (relating to her appeal of the decision to terminate her), this Court cannot say that the evidence of the Defendant's discriminatory or retaliatory intent against Ms. Felix was so apparent that the

Hearing Officer's denial of Ms. Felix's complaints was "conscience shocking." Indeed, the Hearing Officer in each case came to essentially the same conclusion that this Court has on the substantive issues.

The Court has examined the remaining arguments made by Ms. Felix on these claims and finds them to be without merit. Accordingly, the Defendant is entitled to summary judgment on Ms. Felix's constitutional claims arising under § 1983 as well.

Accordingly, the Defendant's Motion for Summary Judgment is granted with regard to all claims by Ms. Felix.

### 3. Ms. Felix's summary judgment motion

Because the Court has found that Ms. Felix has failed to carry her burden of proof in opposition to the Defendant's motion for summary judgment, it is axiomatic that Ms. Felix has not established that the undisputed facts (or those taken in the light most favorable to the Defendant) demonstrate that she is entitled to judgment in her favor as a matter of law on her claims. Accordingly, Ms. Felix's Motion for Summary Judgment is denied.

### C. Objections to Magistrate Judge rulings

In light of the Court granting summary judgment to the Defendant on all claims, most of Ms. Felix's Objections to discovery rulings by the Magistrate Judge are essentially rendered moot. Nevertheless, the Court turns to those Objections for the purpose of ascertaining whether, assuming Ms. Felix's Objections were sustained, the discovery she requests would establish facts that would alter the summary judgment analysis discussed above.

### 1. November 5, 2009 Order compelling responses to interrogatories

During her deposition, Ms. Felix refused to answer certain questions, including a

question as to whether or not she owns any property. She refused to answer the question, and the Defendant moved to compel (**# 75**) a response to that question. By Minute Order (**# 100**) dated November 5, 2009, the Magistrate Judge granted the Defendant's motion in part, specifically directing Ms. Felix to answer[17] "as to whether she owns any properties, the name(s) of the corporation(s) in which she holds an interest and the City and State where the property is located." Ms. Felix filed timely Objections (**# 102**) to the Magistrate Judge's Order, arguing that the request for information about property she owns is irrelevant and prejudicial.

Because this Objection concerns discovery sought by the Defendant, its resolution in Ms. Felix's favor would have no effect on the summary judgment analysis and thus, the Court denies these Objections as moot.

### 2. November 13, 2009 Order denying Ms. Felix's motion to compel

Ms. Felix propounded certain interrogatories and requests for production to the Defendant, including a request that the Defendant produce "the notes (written by caseworkers), 6 month assessment notes, [and] court reports for" 8 specified "Adult Protection clients." Ms. Felix contended that the clients were referenced by name in reprimands and performance evaluations she received, and thus, the contents of the clients' files were relevant to her contention that the reprimands and negative evaluations were not warranted. The Defendant refused to produce the clients' files, claiming that the information was not discoverable and the files were confidential and could not be disclosed without a court order. Ms. Felix then moved (**# 78**) to compel production of the files.

---

[17]It is not clear whether the Magistrate Judge envisioned the answers being provided in writing – *i.e.* as an interrogatory response – or as part of a reopened deposition.

By written Order (**# 101**) of November 13, 2009, the Magistrate Judge denied Ms. Felix's motion. The Magistrate Judge found that Ms. Felix had failed to identify an actionable adverse employment action to support her claims and that, in any event, the requested files bore, if at all, on the "pretext" prong, which requires Ms. Felix to show that the reasons proffered by the Defendant for any adverse actions taken against her are pretextual. The Magistrate Judge went on to explain that the pretext analysis is made in light of the facts as they appeared to the employer, not the employee; in other words, the inquiry is whether the employer <u>believed</u> the facts it was acting upon were true, not whether those facts were objectively true or whether those facts were inconsistent with the employee's own subjective evaluation of her performance. *Citing Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007). The Magistrate Judge found that, with regard to Ms. Felix's contentions that she was retaliated against and harassed by her supervisors, "[w]hether [she] was correct about the handling of a given situation . . . or whether her supervisor was right to insist that she take a different approach is irrelevant to the issues." Ms. Felix filed timely Objections (**# 104**) to the Magistrate Judge's ruling, arguing, among other things, that the Magistrate Judge erred in concluding that Ms. Felix had not suffered an adverse employment action, and that the Magistrate Judge "prematurely found that [the] written reprimand and negative connotations on her yearly evaluation were not linked to her termination."

The Court finds that the requested information would not have any bearing on the summary judgment analysis. As discussed above, Ms. Felix's claims relating to her performance evaluation and written reprimand fail because neither of those events constitute an adverse employment action. The requested discovery would not alter this fact. Thus, Ms. Felix's

Objections to the Magistrate Judge's discovery ruling on this issue are denied as moot.

        3.  <u>September 29, 2009 Order denying Ms. Felix's request to take depositions</u>

On August 12, 2009, Ms. Felix moved **(# 63)** for leave to take depositions of two individuals, Jessica Naberhaus and Robert Driskell, who were hired by the Defendant as supervisors after Ms. Felix was terminated. She contended that deposing these witnesses would reveal that they were unqualified to be hired as supervisors, and this would support her contention that the Defendant had a policy of hiring unqualified persons to act as supervisors (just as Ms. Felix alleged that her supervisor was not qualified for that position).

In a Minute Order dated September 29, 2009 **(# 82)**, the Magistrate Judge denied Ms. Felix's motion, finding that "there is no relevancy." Ms. Felix filed timely Objections **(# 106)** to that ruling, re-raising her contention that these depositions were necessary to establish a municipal custom or policy so as to impose § 1983 liability on the Defendant.

The requested depositions, even if obtained, would not alter the results of the summary judgment analysis discussed above. The Court found that the § 1983 claims could be disposed of on grounds other than the municipal liability issue. Accordingly, these Objections are denied as moot.

**D.  Motion for Leave to File Third Amended Complaint**

Finally, Ms. Felix moves for leave to file a Third Amended Complaint **(# 171)**. She states that the amendments would address three issues: (I) to clarify that her supervisors began discriminating and retaliating against her from the time she complained to Ms. Sanchez that Ms. Kramish was putting clients' lives at risk; (ii) to clarify that her race discrimination claims also encompassed her termination as a discriminatory adverse employment action; and (iii) to allege

that she was "denied liberty interest" as part of her third and fourth claims.

Although Fed. R. Civ. P. 15(a) requires that leave to amend be "freely given," the Court may deny such leave where it finds bad faith, undue delay resulting in prejudice, or where the new claims sought to be added are futile. *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1409 (D. Colo. 1998), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, the Court finds that the requested amendment would be futile. Ms. Felix's summary judgment briefing presented the same arguments that she seeks to amend the complaint to assert, and, as discussed above, those arguments are unavailing. Accordingly, the motion for leave to amend is denied.

## CONCLUSION

For the foregoing reasons, Ms. Felix's Motions to Alter Judgment" **(# 102, 104, 106)**, which the Court construes as Objections under Fed. R. Civ. P. 72(a) to discovery rulings by the Magistrate Judge are **DENIED** as moot. The Defendant's Motion for Summary Judgment **(# 140)** is **GRANTED**, and judgment in favor of the Defendant on each of Ms. Felix's claims shall enter contemporaneously with this Order. Ms. Felix's Motion for Summary Judgment **(# 146**, as supplemented **# 160)** is **DENIED**. Ms. Felix's Motion for Leave to Amend the Complaint **(# 171)** is **DENIED**.

Dated this 28th day of July, 2010

**BY THE COURT:**

_Marcia S. Krieger_
_____

Marcia S. Krieger
United States District Judge

42