IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-02228-MSK-KMT

MICHELLE FELIX,

       Plaintiff,

v.

CITY AND COUNTY OF DENVER,

       Defendant.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR RECONSIDERATION
AND GRANTING, IN PART, MOTIONS FOR REVIEW OF TAXED COSTS**
_____

**THIS MATTER** comes before the Court pursuant to Ms. Felix's Motion for

Reconsideration **(# 202)** of the Court's July 28, 2010 Opinion and Order **(# 196)** granting

Denver's Motion for Summary Judgment, Denver's response **(# 203)**, and Ms. Felix's reply

**(#209)**; and Ms. Felix's Motion for Review of the Clerk's Taxation of Costs **(# 207)**, Denver's

response **(# 213)**, and Ms. Felix's reply **(# 215)**; and Denver's Motion for Review of the Clerk's

Taxation of Costs **(# 208)**, and Ms. Felix's response **(# 214)**.

## FACTS

The Court extensively discussed the operative substantive and procedural facts of this

case in its July 28, 2010 Opinion. Familiarity with that Opinion is assumed and, to the extent

necessary, the discussion in that Opinion is deemed incorporated herein. In summary, Ms. Felix

was formerly employed by Denver as a Social Caseworker. She contends that she was

discriminated and retaliated against for filing complaints of discrimination, that she was

1

unlawfully terminated for reasons related to a disability, and that she was retaliated against for raising complaints about the conduct of her supervisor.

## ANALYSIS

### A.  Motion for Reconsideration

Ms. Felix's Motion for Reconsideration (**# 202**) raises a variety of objections to findings or conclusions reached by the Court in its July 28, 2010 Opinion.  In the interests of efficiency, the Court will address these contentions *seriatim* below.  In doing so, the Court notes that it has continued to afford Ms. Felix's *pro se* pleadings liberal construction under *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

The Court also notes that Ms. Felix's motion for reconsideration is brought pursuant to Fed. R. Civ. P. 60(b). Rule 60(b) permits the Court to reconsider an order due to, among other things, a substantive "mistake or law or fact" by the Court, Fed. R. Civ. P. 60(b)(1), *Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th Cir. 1999), "newly discovered evidence that, with reasonable diligence, could not have been discovered [earlier]," Fed. R. Civ. P. 60(b)(2), or as a result of "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Reconsideration under Rule 60(b) is extraordinary, and may only be granted in exceptional circumstances.  *Rogers v. Andrus Transp. Services*, 502 F.3d 1147, 1153 (10th Cir. 2007).  Reconsideration is not a tool to rehash previously-presented arguments already considered and rejected by the Court, nor properly used to present new arguments based upon law or facts that existed at the time of the original argument.  *FDIC v. United Pacific Ins. Co.*, 152 F.3d 1266, 1272 (10th Cir.1998);  *Van Skiver v. United States*, 952 F.2d 1241, 1243-44 (10th Cir.1991).

With these principles in mind, the Court turns to the particular grounds for

reconsideration raised by Ms. Felix.[1]

> 1. The Court erred in refusing to consider a variety of "corrected"
> motion papers that she filed.

The Court explained its reasoning for considering only certain papers filed by Ms. Felix in its order. *Docket # 196 at n. 1.* The reasons why Ms. Felix felt the need to file numerous corrections and supplements are immaterial, as the Court treated Ms. Felix's filings in precisely the same manner that it would have treated such filings by a attorney. In any event, assuming that Ms. Felix is correct that the "corrected" filings did not materially differ from the "uncorrected" filings, Ms. Felix was not prejudiced by the Court's refusal to consider the corrected versions. Except as noted herein, Ms. Felix has not contended that the Court overlooked evidence that was actually in the record because of mistakes Ms. Felix had made in citing to the appropriate exhibits.

> 2. The Court improperly applied the "liberal construction"
> requirement for construing *pro se* pleadings.

The Court finds Ms. Felix's arguments on this point to be without merit and do not merit further discussion.

> 3. The "emotional and mental harm" that the Court stated on page
> 4 of its Opinion was of "uncertain provenance" was extensively
> discussed and detailed in a deposition of Ms. Felix's psychologist.

Ms. Felix has misunderstood the Court's statement. The Court stated that the legal foundation for Ms. Felix's third claim for relief was of "uncertain provenance," not the evidence supporting Ms. Felix's contentions of mental and emotional suffering was unclear.

---

[1]To the extent that the Court has failed to expressly address a particular argument, it may be inferred that the Court has nevertheless considered the contention and finds it to be without merit.

4.  Although the Court properly recognized that Ms. Felix's two EEOC charges were effectively identical, Ms. Felix never intended to file two charges, but rather, intended the second charge to be a "continuation" of the prior one, and that it was "the EEOC's mistakes" that led to two separate charges being processed.

Ms. Felix previously raised this argument in her briefing, and thus, the matter is not properly subject to reconsideration.  In any event, this contention is moot.  Although the Court found many of Ms. Felix's Title VII claims untimely based on her failure to promptly bring suit after receiving a Notice of Right to Sue on her first charge, the Court nevertheless proceeded to analyze those same claims under § 1981.  Because Title VII and § 1981 claims are subject to the same analysis, the Court's decision to grant summary judgment on the § 1981 claims suffices to explain why Ms. Felix's Title VII claims would, if timely, have also been subject to summary judgment.

5.  The Court erred in concluding that Ms. Felix had not shown a causal connection between her June 27, 2007 EEOC charge and the September 27, 2007[2] decision of Rita Murphey that the accommodation Ms. Felix was requesting was unreasonable, in that Ms. Felix also engaged in protected conduct on August 7, 2007 (filing an appeal to a Hearing Officer of a decision by the Career Service Authority to cease processing a June 19, 2007 complaint Ms. Felix had filed); on October 23, 2007 (filing a complaint with the Career Service Authority against Ms. Murphey for "failure to make a reasonable accommodation for me"); and on November 16, 2007 (filing an EEOC complaint), that latter two of which occurred closely in time to Denver's November 21, 2007 decision formally terminating Ms. Felix.

The latter two contentions are without merit, as the Court previously assumed that Ms.

---

[2]The Court observes that its July 28, 2010 Opinion is internally inconsistent with regard to this date, sometimes referring to the date of Ms. Murphey's decision as September 28, 2007. That discrepancy is immaterial to the analysis of either Denver's summary judgment motion or Ms. Felix's request for reconsideration.

Murphey's decision in the September 27, 2007 meeting was essentially the one that denied Ms.

Felix's request for an accommodation, and that the proceedings thereafter were the inevitable

bureaucratic steps that were necessary to formally effectuate that decision.  In other words, as the

Court explained, it was reasonable to assume that "the die was cast" on September 27, 2007, and

that Ms. Felix's protected activity after that date could not have been the basis for a retaliatory

decision that was effectively made by Ms. Murphey on September 27, 2007.

That leaves only Ms. Felix's contention that she engaged in additional protected activity

on August 7, 2007, a date approximately seven weeks prior to Ms. Murphey's decision not to

allow an accommodation.  This Court has some reservations as to whether this period of time is

sufficient, on its own, to demonstrate the requisite causal connection between the protected

conduct and the adverse action.  *Compare Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179

(10th Cir. 1999) (expressing reservations about sufficiency of nine week period), *citing  Ramirez*

*v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (six week period

sufficient).  Assuming it is, however, Denver would nevertheless be entitled to summary

judgment on Ms. Felix's claim that Ms. Murphey's decision not to extend an accommodation to

her was retaliatory.

Assuming Ms. Felix made out a *prima facie* case of retaliation, the burden would shift to

Denver to articulate a legitimate, non-retaliatory reason for the decision not to grant Ms. Felix's

requested accommodation.  *Anderson*, 181 F.3d at 1179.  Denver has done so, indicating that Ms.

Murphey declined to afford Ms. Felix her requested accommodation because that request – a

change in supervisors – was not one that Denver considered to be reasonable under the

circumstances.  As the Court's July 28, 2010 Opinion notes, the position that a demand for a

change in supervision as an "accommodation" of a disability is one that has been met with significant skepticism by other courts.  *Docket* # 196 at 32-33.  Thus, Denver carried its burden, and Ms. Felix is thus obligated to show that Denver's proffered reason is a pretext for retaliation.

Nothing in Ms. Felix's submissions demonstrates that Ms. Murphey's stated reasons for denying the accommodation were pretext for retaliating against Ms. Felix because of her August 7, 2007 appeal.  The Court is not aware of any evidence in the record that would suggest that Ms. Murphey even knew of the August 7, 2007 appeal,[3] and, even if she did, there is no evidence from which a jury could conclude that Ms. Murphey's decision was based, in any part, on that appeal.  Ms. Murphey's explanation for her decision is facially valid, consistent with the facts in the record, and free of any logical defects that might suggest that the decision that a transfer to a different supervisor was considered by Ms. Murphey to be unreasonable was put forward as an attempt to conceal the fact that Ms. Murphey actually sought to deny the request to punish Ms. Felix for the August 7, 2007 appeal.  Ms. Felix offers nothing more than the temporal proximity between the appeal and the denial of her accommodation, coupled with vague speculation, as her proof that Ms. Murphey's reasons were a pretext for retaliation. Under these circumstances, even if the Court were to reconsider the retaliation claim premised upon Ms. Murphey's decision based on the information provided by Ms. Felix, the Court would nevertheless grant summary judgment to Denver on this claim.

> 6.  The Court erred in finding that Denver's request for Ms. Felix to provide additional documentation of her disability and need for reasonable accommodation was not an adverse action, as "asking a

--------

[3]As best the Court can determine, the complaint being appealed concerned mistreatment of Ms. Felix by her co-workers and supervisors, not by Ms. Murphey.  Thus, it is unclear to the Court how Ms. Murphey should be deemed to be aware of the complaint or appeal.

> lay person who is not a lawyer to provide case law to prove her disability" is "action that would dissuade a reasonable worker from making a charge of discrimination."

This argument is unsupported by any citation to law.  As the Court previously noted, regulations interpreting the ADA expressly contemplate that the employer is entitled to seek clarification of an employee's request for an accommodation.  29 C.F.R. § 1630, Appendix, § 1630.9.  The fact that Ms. Felix subjectively felt that such requests were onerous does not establish that a reasonable employee would have felt that way, much less that a reasonable employee would have felt dissuaded from engaging in protected activity as a result.

> 7.  The Court should have allowed her to amend her complaint to state that "all of these activities together . . . are part of a campaign/continuing violation of her rights," and to better demonstrate "a causal connection between her protected activity of filing a racial discrimination complaint in September of 2006 and negative comments on an evaluation in April of 2007 or a written reprimand in June of 2008."

The Court found that a request to file a Third Amended Complaint would have been futile, as the clarifications Ms. Felix sought to make were extensions of arguments she presented on summary judgment that were found to be without merit.  The Court expressly rejected Ms. Felix's invocation of a "continuing violation" theory, *Docket* # 196 at 10-11, and her attempt to argue a causal connection between events occurring over the span of two-and-a-half years was equally meritless, particularly where the Court determined that the events of April 2007 and June 2008 were not actionable as adverse employment actions in any event.  Nothing in Ms. Felix's current arguments causes the Court to doubt the correctness of its prior ruling.

> 8.  With regard to the claim for First Amendment retaliation, the Court incorrectly assumed that the alleged protected activity was Ms. Felix's complaint to Ms. Sanchez that Ms. Kramish lacked experience and was putting Ms. Felix's clients' lives at risk, and

that the true protected activity was Ms. Felix's discussion of that
event with Roxanne White, the Head of Denver Human Services,
on March 15, 2007.

Although the Court has some doubt that this was the same theory that Ms. Felix

articulated in her briefing on the summary judgment motion, the Court will not undertake a

search of hundreds of pages of loosely-organized argument to confirm such suspicion.  Instead

the Court will assume that Ms. Felix is correct, and it misapprehended her position with regard to

the protected conduct underlying the First Amendment retaliation claim.

Nevertheless, the Court  finds that its analysis is equally-applicable under this new

factual scenario.  The Court found that complaints by Ms. Felix to her superiors about the job

performance of Ms. Kramish were not protected by the First Amendment because they were

made in the discharge of her duties as a Social Caseworker.  Whether those claims were made to

Ms. Sanchez or a higher-level supervisor like Ms. White is largely irrelevant, as both individuals

are those to whom Ms. Felix would be expected to bring work-related grievances.  *See Docket* #

202 at 30 (Ms. Felix's motion stating that "contact with . . . [Ms.] White would not have

occurred at all except as steps in going up the chain of command as part of the grievance

process").  Thus, even if the Court misapprehended Ms. Felix's position regarding to whom her

alleged First Amendment activity was directed, the Court's conclusion that Denver was entitled

to summary judgment on that claim was nevertheless correct.

9.  The Court incorrectly concluded that the same standard in Title
VII and 42 U.S.C. § 1981 retaliation cases applies in First
Amendment retaliation cases, and that the standard for First
Amendment cases is lower, *citing Power v. Summers*, 226 F.3d

8

815, 820-21 (7th Cir. 2000) *and Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990).

The cases cited by Ms. Felix are inapposite.  *Powers* explains that First Amendment retaliation cases differ from Title VII retaliation cases in that the latter "require the plaintiff to prove that the employer's action of which he is complaining altered the terms or conditions of his employment," while the former do not.  226 F.3d at 820.  *Powers* states that the kind of employer action that gives rise to a First Amendment retaliation claim is that which "deter[s] the exercise of those [First Amendment] rights."  In this respect, *Powers* presaged the decision of the U.S. Supreme Court in *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006).  There, the Supreme Court made clear that, for purposes of Title VII retaliation, it was not necessary for an adverse action to have a material impact on an employee's terms or conditions of employment, and that it was enough that the act "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.*  In this regard, *White* brought Title VII retaliation jurisprudence (at least with regard to the requirement of an adverse employment action)  into harmony with the analysis that was previously applied in First Amendment retaliation cases.  In short, *Powers*, when viewed in context with *White*, fully supports this Court's observation that Title VII and First Amendment retaliation cases share a similar analysis.

10.  The Court erred in concluding that Ms. Felix's conduct was not protected by the First Amendment because the Court "referred to the wrong speech and with the wrong person" (*e.g.* Ms. Felix's

protected conduct involved a complaint to Ms. White, not her complaint to Ms. Sanchez), and because the Court's reliance on *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) was misplaced, as Ms. Felix's complaints to Ms. White were "not in the course of performing [her] duties."

The record fully supports the conclusion that Ms. Felix's complaint to Ms. White was not protected speech under the clearly-applicable authority of *Garcetti*. *Garcetti* indicates that the determination of whether workplace speech is protected by the First Amendment or not is made by examining whether the speech is "made pursuant to [the employee's] duties." 547 U.S. at 421. Thus, in ascertaining the status of Ms. Felix's speech, the question is whether reporting to her supervisors concerns that Ms. Kramish was making decisions that placed clients of the agency in jeopardy is something that Ms. Felix "was employed to do." *Id.* There can be little doubt that a Caseworker like Ms. Felix would be expected, as part of her duties, to advise her superiors if her supervisor was instructing her to take actions that would jeopardize the clients' safety or health. (This is best illustrated by contemplating the opposite situation. If it was later determined by Ms. Felix's superiors that Ms. Felix had been aware of misconduct or poor performance by Ms. Kramish, and yet Ms. Felix had chosen to remain silent about what she knew, would the superiors have been likely to discipline Ms. Felix for refusing to report her concerns?)[4] This Court sees no basis for reconsideration of this conclusion.

     11. The Court erred in not addressing Ms. Felix's race

---

[4]This assumes, of course, that Ms. Felix's belief that Ms. Kramish was issuing dangerous instructions was justified. The record appears to reflect that Ms. Felix harbored a good-faith belief that Ms. Kramish was engaging in misconduct, and that she brought those complaints to Ms. Sanchez and Ms. White out of a sense of duty to the agency and its clients. The record also appears to reflect that Ms. Sanchez and Ms. White did not share Ms. Felix's opinion of the (im)propriety of Ms. Kramish's actions, but this disagreement has no bearing on the question of whether Ms. Felix's speech was protected under *Garcetti*.

10

discrimination claims under § 1981, even if the Court found them
to be time-barred under Title VII.

Notwithstanding the fact that the Court found the Title VII race discrimination claims

time-barred, it nevertheless explained why those claims would not be viable in any event,

whether under Title VII or § 1981, as Ms. Felix had not identified any actionable adverse

employment action other than her termination, and that she had failed to demonstrate

circumstances giving rise to an inference of discrimination with regard to the termination.

*Docket* # 196 at 28-29.

> 12. The Court erred in concluding that the written reprimand,
> negative comments in Ms. Felix's evaluation, and the refusal to
> transfer her to a different supervisor were not adverse employment
> actions, because the Court "considered these events separately
> instead of one continuing violation which eventually led to the
> Plaintiff's termination," *citing Furr v. AT&T Technologies, Inc.*,
> 824 F.2d 1537 (10th Cir. 1987), and that the Court erred by
> applying "the wrong legal standard" by requiring that actions be
> "materially adverse" before giving rise to liability.

The Court properly examined each of these discrete acts separately, rather than as a

"continuing violation."  As explained by the Court in page 10 of its July 28, 2010 Opinion., the

Supreme Court effectively abrogated the "continuing violation" doctrine in circumstances such

as those presented here. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002).

The various acts that Ms. Felix complaints of – negative evaluations, reprimands, and refusals of

requests to transfer – are discrete actions whose accrual date can be easily determined, and thus,

cannot give rise to a "continuing violation" theory under *Morgan*.  Cases such as *Furr* that

articulate a different conception of the "continuing violation" doctrine were effectively overruled

by *Morgan*.  Finally, the Court finds that it correctly determined and applied the standard set

forth in *White* for determining adverse actions under both retaliation and non-retaliation theories.

11

13. The Court erred in finding that, for purposes of the race discrimination claim, Cheryl Briener was not similarly-situated to Ms. Felix, and that the Court should have limited its analysis to whether the two were subject to the same supervision and governed by the same standards of performance and discipline, not whether the two had similar requests for accommodation.

The requirement of showing more favorable treatment to a "similarly-situated" employee of a different protected class is that the employees be similar "in all material respects." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).   A difference in supervisory attitudes or differing performance standards across departments have proven to be a common defense to disparate treatment claims, leading the courts to emphasize that the "similarly-situated" analysis encompasses these commonalities as well. *Id.* at 1232.  But simply having a same supervisor and being subject to the same work rules does not end the "similarly-situated" analysis. *Id.* ("a court should also compare the relevant employment circumstances, such as work history . . . in determining whether they are similarly situated"); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Sometimes apparently irrational differences in treatment between different employees that cannot be explained on the basis of clearly articulated company policies may be explained by the fact that . . . that the events occurred at different times when the company's attitudes toward certain infractions were different, or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished, or even that the less severely sanctioned employee may be more valuable to the company for nondiscriminatory reasons than is the other employee . . . [I]t is up to the plaintiff to establish not only that differential treatment occurred, but also to rule out nondiscriminatory explanations for the differential treatment").

Here, the Court found that Ms. Felix was not similarly-situated to Ms. Briener, in that

Ms. Briener requested additional unpaid leave at the conclusion of her paid FMLA leave, whereas Ms. Felix demanded the ability to return to work under a specific accommodation.  The difference in the requests made by Ms. Briener and Ms. Felix  constitute circumstances that differentiate between them, such that one would  reasonably expect that Denver's reaction to both employees would be the same absent discrimination.  Put differently, Ms. Felix has not rebutted the assumption that, upon exhausting her paid FMLA leave (as Ms. Briener did), had she instead asked to remain on unpaid FMLA leave (as Ms. Briener did), Denver might have acceded to her request; in contrast, the record does not rebut the assumption that, had Ms. Briener insisted on returning from her leave by means of an accommodation that Denver deemed unreasonable (as Ms. Felix had), Denver would not have terminated Ms. Briener.  Because the circumstances of Ms. Felix's situation and Ms. Briener's situation diverged with respect to this key fact, the Court properly concluded that they were not similarly-situated for purposes of Ms. Felix's discrimination claims, notwithstanding the fact that they may have shared a supervisor and performance expectations.

> 14.  The Court erred in not addressing, as part of the race discrimination claim, Ms. Felix's contention that individuals such as Julie Bock "was not disciplined for being involved in more serious conduct than [Ms. Felix]" and that only two employees – Ms. Felix and Ms. Robinson – that have ever been denied a transfer in the Adult Protection Services office are both black.

The Court did not reach the pretext issue (where the presence of similarly-situated white employees might become relevant) on the race discrimination claims because the Court found that Ms. Felix had not shown a *prima facie* case, in that she was not subjected to any adverse employment action other than her termination.  *Docket #* 196 at 28-29.  Thus, evidence that other black workers like Ms. Robinson were denied transfers is irrelevant because the denial of

13

the transfer requested by Ms. Felix did not amount to an actionable adverse employment action.

Ms. Bock's situation, as described by Ms. Felix, concerned Ms. Bock not getting disciplined for

"breaking the confidentiality of several Adult Protection clients."  Ms. Felix was not terminated

for breaking confidentiality, and thus, Ms. Bock is not similarly-situated to Ms. Felix for

purposes of her termination.

> 15.   Contrary to the Court's identification of "ambiguities" in the
> record, Ms. Felix's psychologist "made it clear that [Ms. Felix]
> was definitely capable of performing the essential functions of her
> job with the requested accommodation"

This issue is responsive to a passage in the Court's Opinion that expresses uncertainty as

to whether Ms. Murphey declined Ms. Felix's request for a reasonable accommodation on the

grounds that Ms. Felix was not disabled (*i.e.* that Ms. Felix did not have an impairment that

substantially limited her ability to perform the major life activity of working) and thus not

entitled to any accommodation, or whether she denied the request on the grounds that Ms. Felix

was disabled but that the accommodation she was requesting (*i.e.* a change of supervisors) was

unreasonable. *Docket* # 196 at 31-32.   Through this argument, Ms. Felix appears to be arguing

that the record supports the latter conclusion.  Ultimately, it is unnecessary to resolve the Court's

question, as the Court found that Ms. Murphey's eventual decision – that the requested

accommodation was unreasonable – was consistent with the evidence in the record.

> 16.   The Court erred in finding that Ms. Felix had not shown that
> there was a vacancy under another supervisor to which she could
> have been transferred, and that in November 2007, Kelsey
> Robinson was willing to switch units (and supervisors) with Ms.
> Felix and that she informed Ms. Murphey of this fact in a letter
> dated October 10, 2007.

This issue relates to the Court's conclusion that a transfer to another supervisor might

constitute a reasonable accommodation required under the ADA if: (i) the employer previously permitted employees to transfer supervisors upon request; and (ii) there was a vacancy under the supervisor to whom the employee sought to transfer. *Docket* # 196 at 34-35. The Court found that Ms. Felix had come forward with some evidence as to the former, but had not demonstrated the latter.

Ms. Felix points to deposition testimony of Ms. Robinson, attached to Ms. Felix's Motion for Summary Judgment.[5] *Docket* # 146, Ex. 8. Although somewhat difficult to follow, the deposition excerpt seems to entail Ms. Robinson reading from a unknown document – apparently written by Ms. Felix – and then commenting on its accuracy. As best the Court can determine, Ms. Robinson's independent comment begins at the bottom of page 17 of the transcript, where Ms. Robinson relates that she and Ms. Felix met with Ms. Wentworth (Ms. Robinson's supervisor), in or about May 2007, expressing a desire to "switch units," such that Ms. Felix would take Ms. Robinson's place in Ms. Wentworth's unit, and Ms. Robinson would take Ms. Felix's position under Ms. Kramish. Ms. Robinson recalls that Ms. Wentworth "was livid" at the suggestion, believing that the women had "not followed protocol." Eventually, Ms. Felix left the meeting, at which point Ms. Wentworth "went crazy on [Ms. Robinson]," telling her that she "didn't know what [she] was getting into" and that she "was to stay out of it," which, Ms. Robinson stated "I did at that point."

The Court will assume, without necessarily finding, that Ms. Robinson's willingness to

---

[5]Although the Court has some doubt that Ms. Felix's motion clearly and conspicuously pointed the Court towards Ms. Robinson's testimony for purposes of establishing Ms. Robinson's willingness to swap supervisors, the Court will, for purposes of the instant motion, assume that it overlooked the Plaintiff's argument and evidence on this point.

switch supervisors with Ms. Felix in September 2007 would, if proven, have created a "vacancy" under Ms. Wentworth in September 2007, thus making Ms. Felix's request for a transfer a reasonable accommodation. *But see Docket* # 196 at 36 (suggesting that a request that employees volunteering to be "traded" among supervisors might impose excessive organizational costs and suggesting that only "vacant" positions might permit accommodation via transfer). Nevertheless, the Court finds that Ms. Felix's evidence on this point establishes only that Ms. Robinson was amenable to the idea in <u>May</u> 2007; there is no evidence that Ms. Robinson remained willing to switch supervisors as of <u>September</u> 2007, when Ms. Felix sought the transfer to accommodate her alleged disability. Ms. Felix appears to believe that Ms. Robinson remained willing to switch up to and including September 2007, but that is not necessarily a reasonable inference to be drawn from Ms. Robinson's actual testimony. Ms. Robinson certainly does not expressly state that she remained willing to switch supervisors after May 2007, and indeed, her testimony indicates that she was surprised by the fierce emotion that the suggestion invoked in Ms. Wentworth and, when advised to "stay out of it" by Ms. Wentworth, Mr. Robinson did so, thereby withdrawing her consent to a "trade."

Under these circumstances, the Court cannot say that Ms. Felix has carried her burden of showing that Ms. Robinson remained willing to switch supervisors when Ms. Felix proposed a supervisory transfer as an accommodation in September 2007. Ms. Felix (who was not present, according to Ms. Robinson, when Ms. Wentworth advised Ms. Robinson to "stay out of it") may have believed that Ms. Robinson remained willing to agree to a swap, but Ms. Robinson apparently experienced a change of heart. Consequently, even upon reconsideration of this issue in light of Ms. Robinson's testimony, the Court would nevertheless have reached the same result.

17. The Court erred in "drafting an order granting attorney's fees against [Ms. Felix]."

Nothing in the Court's Opinion awarded attorney's fees against Ms. Felix.  The Court awarded costs to Denver, as is required by Fed. R. Civ. P. 54(d)(1), but made no mention of an award of fees.

As the Court previously noted, to the extent that it has not expressly addressed arguments raised by Ms. Felix in the Motion for Reconsideration, the Court has nevertheless considered those arguments and finds them to be without merit.  Ms. Felix's Motion for Reconsideration is granted in part, insofar as the Court has reconsidered certain aspects of its decision where there is some basis to believe that the Court may have overlooked evidence cited by Ms. Felix, but upon such reconsideration, the Court nevertheless reaches the same conclusion that it previously did.

### B.  Motion for Review of Costs

The Clerk of the Court taxed costs (# 205) against Ms. Felix in the amount of $ 1,239.10.  That sum consisted of $175.20 and $ 154.95, each relating to the costs of transcribing two separate depositions of Ms. Murphey, $ 770.45 in costs for obtaining a transcript of Ms. Felix's deposition, and $ 138.50 in copying costs.[6]  Ms. Felix objects (# 207) to each of these items as discussed below.  Separately, Denver objects (# 208) to the Clerk's refusal to tax the remaining $8,991.55 in costs sought by Denver, which included costs of the transcripts of 9 other witnesses, and the costs of J. Tashof  Bernton, an expert witness retained by Denver.

---

[6]The copying costs related to various filings by Denver in support of Denver's own summary judgment motion or in response to Ms. Felix's various filings.  The Clerk awarded Denver $ 0.50 per page in copying costs.

28 U.S.C. § 1920 allows the Court to tax as costs certain items, including the deposition transcript and document costs claimed here, if those items were "necessarily obtained for use in the case."  The party seeking an award of costs bears the burden of showing the necessity of the costs incurred. *Allison v. Bank One-Denver*, 289 F.3d 1223, 1248-49 (10th Cir. 2002).

Whether an item is "necessarily obtained for use in the case" is a fact-based inquiry, committed to the discretion of the Court. *Aerotech Resources, Inc. v. Dodson Aviation, Inc.*, 237 F.R.D. 659, 665 (D.Kan. 2005). For example, where a case is "sufficiently lengthy, complex, [or] contentious" that a transcript is reasonably necessary for effective and efficient trial preparation or presentation, transcription costs might be allowed. *Compare Burton v. R.J. Reynolds Tobacco Co.*, 395 F.Supp.2d 1065, 1079 (D.Kan. 2005) *with Battenfeld of America Holding Co. v. Baird, Kurtz & Dobson*, 196 F.R.D. 613, 618 (D.Kan. 2000) (finding that trial was not so complex that daily transcripts were taxable). On the other hand, transcriptions that are obtained solely for discovery purposes or for the "convenience of counsel" are generally not taxable. *Id.; Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 878 F.Supp. 1417, 1427 (D.Kan. 1995). Transcripts that are obtained for use in summary judgment responses, but not used at trial, may be taxed if the depositions were "actually utilized by the court in considering the defendant's motion." *James v. Coors Brewing Co.*, 73 F.Supp.2d 1250, 1261 (D.Colo. 1999), *citing Tilton v. Capital Cities/ABC, Inc.*, 115 F.3d 1471, 1474 (10th Cir.1997). Necessity is judged as of the time the transcription was sought, not in hindsight. *In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1144, 1147-48 (10th Cir. 2009); *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1248 (10th Cir.1988).

Turning first to the costs the Clerk did tax, Ms. Felix contends that the deposition

18

transcripts of Ms. Murphey and of Ms. Felix were obtained by Denver "as a matter of convenience." She contends that Denver "could have included all of [its] questions in [its] interrogatories," and that Ms. Felix would have provided "a certified copy of [Ms.] Murphey's deposition" upon request. Ms. Felix also points out that she filed full copies of her own deposition and Ms. Murphey's depositions with her own Motion for Summary Judgment.

Turning first to Ms. Felix's deposition, the Court begins with the premise that taking the deposition of the plaintiff in a case – particularly in an employment discrimination case – will almost always be necessary. This is particularly true in cases such as this one, where the plaintiff appears *pro se* and pleads numerous, lengthy, and factually-complex claims for relief. Ms. Felix's suggestion that written interrogatories can substitute for an oral deposition ignores the fact that interrogatories offer inadequate opportunities to refine questions, seek clarification, or follow up on answers compared to oral depositions.

As this Court has noted, however, there is a difference between the necessity of taking a deposition and the necessity of transcribing one. *Crandall v. City and County of Denver*, 594 F.Supp.2d 1245, 1250 & n. 6 (D. Colo. 2009). There may be circumstances where it is entirely reasonable for a party to take a deposition of the plaintiff, but conclude that it is not necessary to have that deposition transcribed. Such cases will likely be rare.[7] In most instances, transcription of the plaintiff's deposition is usually deemed necessary by a defendant to ensure that the plaintiff's allegations do not expand or change as the litigation progresses, to allow for

---

[7]Arguably, *Crandall* was such a case. There, the relief sought was entirely prospective and the factual issues in dispute largely concerned scientific and engineering principles. The subjective complaints of the plaintiffs themselves were largely incidental to the dispute, and thus, transcription of the plaintiffs' depositions may not have been necessary.

preparation of a dispositive motions and a trial case based on a objectively-ascertainable factual record, and to allow for impeachment at trial if needed.  Thus, the Court would be reluctant, in all but the most unusual cases, to find that the costs of transcribing the plaintiff's deposition are not taxable.

Denver's response to Ms. Felix's request for review of taxed costs is entirely conclusory, making no effort to explain why Denver elected to have her deposition transcribed.  In similar circumstances, the Court has refused to tax such costs.  *Id.*  However, Denver did make use of Ms. Felix's deposition transcript when moving for summary judgment, citing to the deposition for, among other things, Ms. Felix's admission that no incidents of retaliatory harassment occurred after she went on FMLA leave and that she did not bring suit based on the first Right to Sue letter.  Although the Court somewhat agrees with Ms. Felix that these are largely ephemeral issues that may not have required testimonial proof, the fact remains that actual use of a deposition transcript in proceedings before the Court is evidence of it having been "necessarily obtained."  *Id.* at 1254, *citing Summit Technology Corp. v. Nidek Co., Ltd.*, 435 F.3d 1271, 1380 (Fed. Cir. 2006).  Thus, although the Court has significant reservations about the sufficiency of the showing made by Denver with regard to the necessity of obtaining a transcript of Ms. Felix's deposition, the Court nevertheless finds that it was not improper for the Clerk to tax this cost against Ms. Felix.

Similarly, the Court finds that Denver is entitled to the costs of obtaining transcripts of Ms. Murphey's deposition.  Although Ms. Murphey, as the apparent decisionmaker regarding Ms. Felix's termination, was a key witness in this case, it is not entirely clear how closely-connected Ms. Murphey was to Denver, in its capacity as Defendant.  As noted in *Crandall*,

Denver may have had a variety of options short of deposing Ms. Murphey to ascertain the need

to memorialize her testimony, and had additional options in determining whether to obtain a

transcription of that testimony.  *Id.*  Likewise, as noted above, Denver has made only a skeletal

and conclusory showing of the need to obtain Ms. Murphey's deposition testimony.  On the

other hand, Denver specifically used Ms. Murphey's deposition testimony in its own summary

judgment motion, as did Ms. Felix in her motion.  Given that both parties saw fit to rely on Ms.

Murphey's deposition testimony to some degree, the Court cannot say that it was not necessary

for Denver to do so.  Accordingly, the Court finds that the Clerk properly taxed the costs of Ms.

Murphey's depositions.[8]

Ms. Felix's remaining objection to the Clerk's taxation of costs is the Clerk's decision to

award $0.50 per page in copying costs; Ms. Felix contends that $0.07 per page is more

reasonable.  Although Ms. Felix does not provide evidentiary support for her proposed rate, the

Court notes that Denver offers no justification for its chosen rate, either.  The Court notes other

decisions where courts have taxed copying costs at rates of $ 0.12 per page, *Johnson v. Holway*,

522 F.Supp.2d 12, 20-21 (D.D.C. 2007); $0.10 per page, *James v. Wash Depot Holdings, Inc.*,

242 F.R.D. 645, 651-52 (S.D. Fl. 2007) (noting range of $0.10 to $0.25 per page is prevalent in

that District and that "the photocopying rate should approximate that of local print shops, unless

the requesting party is able to provide factual support for the reasonableness of the higher

---

[8]Ms. Felix argues that she would have shared her copies of her own deposition and Ms. Murphey's depositions with Denver, had it asked.  Were Ms. Felix to come forward with evidence that this offer was made to Denver at the time Denver requested transcription of those depositions, the Court might be disinclined to tax the full costs in favor of Denver.  But the record does not reflect when, if at all, Ms. Felix expressed such an offer to Denver, and thus, the Court does not consider it.

in-house rate"); and $0.05 per page, *Tinch v. City of Dayton*, 199 F.Supp.2d 758, 770 (S.D. Oh. 2002).  The Court finds the analysis in these cases, particularly *James*, to be persuasive and concludes that, absent a showing from Denver that a lesser rate was somehow impractical to obtain, copying costs should be taxed at a rate commonly found at local print shops.  Ms. Felix acknowledges her belief that that rate is $0.07 per page, and in the absence of evidence from Denver as to a different rate, the Court will adopt the rate suggested by Ms. Felix.  The Clerk taxed a total of 277 pages, and at a rate of $0.07 per page, that cost comes to $19.39.  Thus, the costs taxed by the Clerk are reduced by $ 119.11 to $ 1,119.99.

The Court then turns to Denver's request for additional costs.  It first requests that the Court tax the costs of obtaining deposition transcripts of 8 additional witnesses.  Denver acknowledges that it did not use the depositions in its summary judgment motion or response, but argues that Ms. Felix cited to each of the depositions in her own moving papers.  Denver does not provide any other explanation as to what it was necessary for it to obtain these transcripts. The fact that Ms. Felix saw fit to do so at her own expense is no justification for awarding the same costs to Denver, particularly in the absence of any evidence as to why Denver considered those depositions necessary.  *See Crandall*, 594 F.Supp.2d at 1252-53.  Accordingly, the Court will not tax these costs.

Denver seeks the costs of obtaining a transcription of a Career Service Hearing concerning some of Ms. Felix's grievances.  28 U.S.C. § 1920(2) permits the taxing as costs of "fees for printed or electronically recorded transcripts necessarily obtained for use in the case," making it clear that taxable transcripts can include those from other proceedings, so long as they are "necessary" to the instant case.  Denver cited to the Career Service Hearing transcript in two

respects in its summary judgment motion: once for the proposition that Ms. Felix refused to accept any accommodation other than a transfer of supervisors, and once for the proposition that Ms. Felix could not demonstrate a due process claim arising out of the results of that hearing. The Court's summary judgment ruling expressly acknowledges the Court's consideration of the January 30, 2008 hearing transcript. *Docket* # 169 at 37. Accordingly, the Court finds that this transcript should be taxed as costs against Ms. Felix. The amount claimed by Denver for this transcript is $ 585.15.

Finally, Denver seeks the costs of its own expert, Dr. Bernton. 28 U.S.C. § 1920 does not facially contemplate an award of a non-court appointed expert witness' fees or other expenses, beyond the ordinary witness fee taxable under § 1920(3). *Compare* 28 U.S.C. § 1920(6) (permitting taxation of court-appointed experts' costs). Accordingly, absent some statutory authority specifically permitting the taxation of expert fees, taxation of costs for Dr. Bernton would be limited to his witness fee and mileage under 28 U.S.C. § 1821(b). *Brown v. Butler*, 30 Fed.Appx. 870, 875-76 (10th Cir. 2002) (unpublished); *Miller v. Cudahy Co.*, 858 F.2d 1449, 1461 (10th Cir. 1988). Denver's itemization of its fees claimed for Dr. Bernton does not indicate what amount, if any, Mr. Bernton was advanced for expenses under 28 U.S.C. § 1821(b),[9] and thus, the Court does not tax any costs for Dr. Bernton.

Accordingly, both parties' motions requesting review of taxed costs are granted in part and denied in part. The Court finds that the amount of costs properly taxed in this action are: $175.20 and $ 154.95 relating to Ms. Murphey's depositions; $ 770.45 relating to Ms. Felix's

---

[9]There is no evidence in the record that Dr. Bernton was subpoenaed, deposed, or otherwise subjected to "attendance" giving rise to fees under § 1821(b). Indeed, the basis of the $ 7,087.50 claimed by Denver as costs for Dr. Bernton are entirely a mystery.

deposition, $19.39 in copying charges, and $ 585.15 relating to the Career Services Hearing transcript, for a total of $ 1,705.14 in taxable costs awarded to Denver.

## CONCLUSION

For the foregoing reasons, Ms. Felix's Motion for Reconsideration (**# 202**) is **GRANTED IN PART**, insofar as the Court has reconsidered those matters discussed herein, but **DENIED IN PART**, insofar as, upon such reconsideration, the Court reaches the same result as it did in the July 28, 2010 Opinion.  Both sides' Motions to Review Taxation of Costs (**# 207, 208**) are **GRANTED IN PART** and **DENIED IN PART** as set forth herein.  The amount of costs taxed against Ms. Felix is $ 1,705.14, and the Judgment (**# 199**) is **DEEMED AMENDED** to award that sum to Denver and against Ms. Felix.

Dated this 23rd day of March, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge